Docket No. 80107–Agenda 2–September 1997.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. 

 GENO F. MACRI, Appellant.

Opinion filed October 29, 1998.

JUSTICE McMORROW delivered the opinion of the court:

The defendant, Geno F. Macri, was charged by indictment with one count of intentional murder (720 ILCS 5/9–1(a)(1) (West 1994)), one count of knowing murder (720 ILCS 5/9–1(a)(2) (West 1994)), four counts of felony murder (720 ILCS 9–1(a)(3) (West 1994)), one count of aggravated criminal sexual assault (720 ILCS 5/12–14(a)(2) (West 1994)), and one count of unlawful possession of a stolen motor vehicle (625 ILCS 5/4–103(a)(1) (West 1994)). Following a bench trial in the circuit court of Du Page County, defendant was found guilty of all charges. Defendant thereafter requested a jury for the sentencing proceedings. In the first phase of the sentencing hearing, the jury found defendant eligible for the death penalty on four separate eligibility factors: defendant committed the murder in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a life by unlawful means (720 ILCS 5/9–1(b)(11) (West 1994)); and defendant committed the murder in the course of an aggravated criminal sexual assault (720 ILCS 5/9–1(b)(6) (West 1994)), in the course of an armed robbery (720 ILCS 5/9–1(b)(6) (West 1994)) and in the course of a robbery (720 ILCS 5/9–1(b)(6) (West 1994)). After hearing additional evidence in the second phase of the hearing, the jury concluded that there were no mitigating factors sufficient to preclude the imposition of the death penalty. Accordingly, the trial court sentenced defendant to death. The trial court also sentenced defendant to 60 years' imprisonment on the aggravated criminal sexual assault conviction, and a consecutive 7 years' imprisonment on the possession of a stolen motor vehicle conviction. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d Rs. 603, 609(a). Defendant's appeal is limited solely to alleged errors committed by the trial court during the sentencing proceedings. For the reasons which follow, we affirm defendant's sentence.

BACKGROUND

Defendant's convictions stem from the murder of Maria Djordjic, who was killed by repeated blows to the head with a crowbar on August 14, 1993. During the eligibility phase of the sentencing hearing, the State called 21 witnesses, essentially duplicating its presentation at the guilt-determination phase of the proceedings, while the defense called one witness.

Testimony during the eligibility hearing established that in the fall of 1992, defendant moved into the one-bedroom condominium of Floyd and Susan Graf, which was located in Addison, Illinois, a suburb of Chicago. Defendant, who was acquainted with Floyd Graf as a result of their working together, converted the den of the condominium into a bedroom and had been paying the Grafs rent in the amount of $60 per week. The victim, Maria Djordjic, was a close friend of Susan Graf. On occasion, Maria stayed in the Grafs' home and slept on the sofa bed located in the living room. At the end of July 1993, Maria, who was 19 years old at the time of her murder, had moved out of an apartment she had shared with a girlfriend and asked the Grafs if she could stay with them for a few weeks until she could move back into her father's home in preparation of returning to college in the fall. Around this same time, defendant had been given notice by the Grafs to move out of the condominium because he had failed to pay rent and cover his own expenses.

The testimony further established that on Saturday, August 14, 1993, Floyd Graf departed the condominium at 7:30 a.m. for his job and Susan left around noon with their three-year-old daughter, Marcie, to attend a relative's birthday party. At the time Susan and Marcie left, Maria was sleeping on the sofa bed. When Susan and Marcie Graf returned on the afternoon of August 14, 1993, they discovered Maria's body on the sofa bed, naked from the waist down, her head covered with a pillow. Defendant had disappeared, along with Maria's purse, VCR and car.

Defendant's arrest for the murder of Maria Djordjic occurred in New York City on June 10, 1994, nearly one year after the crime took place. Upon learning of defendant's arrest, Detectives Mark Van Stedum and Michael Simo, both of the Addison police department, flew to New York City. Detective Van Stedum testified that after informing defendant of his 
Miranda
 rights, he and Detective Simo began an unrecorded conversation with defendant, during which defendant confessed to Maria's murder and recounted details of the crime. Detective Van Stedum testified that this first conversation lasted a little over an hour and defendant thereafter agreed to give a taped statement repeating his confession.

The sentencing jury heard both Detective Van Stedum's testimony recollecting defendant's first statement to the police, as well as the audio tape of defendant's confession. In his conversations with the detectives, defendant recounted that the week before the murder, the Grafs had given defendant three weeks' notice to vacate the premises due to defendant's unpaid bills. Defendant also stated that he had missed a meeting with his probation officer, and he knew that a warrant for his arrest would be forthcoming. Defendant then told the detectives that on the day of the murder, he was alone in the condominium with Maria and he saw her sleeping on the sofa bed. She then got up, took a shower, and dressed in green shorts and a top. Defendant asked Maria if she wanted “to fool around a little bit, kiss and stuff like that.” Maria declined and defendant stated that he “got upset.” Defendant told the detectives that he went into his bedroom to retrieve a crowbar, returned to Maria, who was sitting on the corner of the sofa bed, and hit her over the head with the crowbar. Defendant related that after the first time he struck Maria in the head, she fell back on the bed and started bleeding. Defendant then jumped on top of her and repeatedly hit her in the head with the crowbar. Although Maria initially attempted to fend off the blows by lifting her hands and kicking at him, defendant stated, she eventually stopped moving and, at that point, defendant believed that he had killed her. Defendant told the detectives that he thereafter tried to clean up some of the blood splatters on the wall behind the sofa bed, and then he cleaned himself up and did his laundry. Defendant related that while his laundry was washing, defendant placed a pillow over Maria's head, took off her green shorts, and had sexual intercourse with her. Defendant stated that he then took Maria's car and drove to a neighboring suburb, where he pawned Maria's VCR, as well as some of his own items. According to defendant, he then returned to the condominium, gathered his laundry from the dryer, packed his things together, and planned to take Maria's car and go to New York City. Defendant related that on the way out of the Grafs' condominium, he again saw Maria lying on the sofa bed and had sexual intercourse with her a second time. Defendant told the detectives that on both occasions that he had intercourse with her, he believed Maria was dead. Defendant stated to the detectives that he covered Maria's head with a pillow before he left.

The detectives questioned defendant about the crowbar. Defendant stated that he kept the crowbar in his room and that he had purchased it for “protection” and “for, you know, 'cause I–I was–the year before I was, you know, kind of planning on doing the same thing.” When Detective Van Stedum inquired whether defendant meant hitting a girl over the head, defendant replied, “Right, or taking her purse or, you know ***.” Defendant stated that he had planned to commit these attacks along the Illinois Prairie Path.

Defendant related to the detectives that on his way to New York, he stole Ohio license plates to replace the Illinois plates on Maria's car. Defendant further stated that he had attempted to sell Maria's car at six different car dealerships in New Jersey, but because none would purchase the car without the title, he ended up selling pieces of the car. Defendant also told the detectives that he had unsuccessfully attempted to use Maria's ATM card in a bank in New Jersey.

In addition to his testimony concerning defendant's confession, Detective Van Stedum related occurrences in the investigation which took place in the days after Maria's murder. On August 15, the day after the murder, Van Stedum had a conversation with Tom Richardson, a friend of defendant. Van Stedum testified that he and Richardson went to an Ace Hardware store in Addison where Richardson identified a crowbar similar to the crowbar Richardson had previously seen in defendant's possession. On August 17, Van Stedum received information from the Itasca Bank that Maria's ATM card had been used at an ATM machine at the United Jersey Bank in Teterboro, New Jersey. Detective Van Stedum also testified that he was called back to the murder scene by Floyd Graf on the 18th of August, because Graf had discovered a green pair of shorts and a black pair of underwear rolled up inside the shorts under a chair in defendant's room. Van Stedum related that on August 19, he received a call from the New York City police department that Maria's vehicle, which displayed stolen Ohio license plates, had been recovered. On that date Van Stedum also received copies of photo stills from the videotape taken at the United Jersey Bank showing defendant using Maria's ATM card.

Testimony from Floyd and Susan Graf was presented to the jury. Floyd Graf testified that he had met defendant in 1990 at Olympus Auto Parts, where both men worked, and defendant had come to live with them in the fall of 1992. However, defendant failed to make his rent payments and in August 1993, the Grafs' phone was disconnected because defendant had made excessive calls to “900” numbers. Graf stated that he took away defendant's house keys and told defendant to move out. According to Graf, on the day of the murder, Graf had left for work at 7:30 a.m. and did not return to his home until Maria's body had been found by his wife and daughter. Graf related that a few days after the murder, the police allowed him to go back into his apartment, and, while he was clearing everything out with the intention of moving, he found a pair of green shorts with black underwear inside under a chair in defendant's room. He then called police and Detective Van Stedum came to investigate.

Susan Graf testified that Maria had been her best friend for five years, and that prior to moving into their apartment, Maria would stay with them a few times per month. According to the witness, Maria purchased the VCR and left it at the Grafs' residence so that the Grafs' three-year-old daughter, Marcie, could watch videos. The witness further testified that a few weeks before the murder she and her husband told defendant to move out of their residence because defendant owed them money for the rent and other expenses, and that defendant stole money from their daughter's piggy bank. On the day of the murder, Susan and her daughter Marcie left their residence to attend a birthday party shortly before noon, and when they returned at approximately 5 p.m., Marcie discovered Maria's body on the sofa bed.

The State then called several witnesses who testified to defendant's whereabouts on the afternoon of the murder. William Madalinski, a friend of defendant, testified that on August 14, he and another friend, Ernie Silvesteri, went to defendant's apartment to see if defendant wanted to play basketball. Madalinski stated that sometime between 12:20 p.m. and 12:45 p.m., Silvesteri beeped his car horn from the parking lot and defendant came to the window. From the window, defendant told them that he did not want to go with them, and, a few minutes later, defendant came down to the parking lot and repeated that they should go without him. George Jakes testified that he worked at Village Pawn and Jewelry in Elk Grove Village, and that defendant pawned a Goldstar VCR on August 14, 1993. The bill of sale for that transaction showed the time as 1:40 p.m., and was signed by defendant. Denise Feinberg, a neighbor of the Grafs, testified that at about 2 p.m. on August 14, she was sitting in a chair by the window looking down at the complex's parking lot and saw defendant drive Maria's car into the lot.

The State next called witnesses to testify regarding the scene of the crime. Richard Carnaggio, a firefighter/paramedic for the Addison fire department, arrived at the scene and found Maria lying on the sofa bed with a pillow over her head. As he removed the pillow, a sock, which was stuck to the pillow as a result of dried blood, was dislodged from Maria's mouth. Carnaggio stated that he observed a great deal of blood at the scene, and that the large wounds to Maria's head resembled a crushing injury. Michael Tierney, an Addison police officer assigned to assist as an evidence technician in the murder investigation, testified that a sock matching the sock recovered from Maria's body was found in defendant's room.

Dr. Shaku Teas, a forensic pathologist, testified that she performed the autopsy on Maria on August 15, 1993. Upon an external examination of the injuries to Maria's head, Dr. Teas discovered multiple chop and incised wounds of varying lengths scattered over Maria's face and to both sides of her head. Dr. Teas also testified to numerous blunt trauma injuries, bruises, and abrasions which were visible on Maria's face and head. Dr. Teas also found defensive wounds on Maria's hands, with bruising on the left hand and bruises, abrasions, and characteristics of a sharp instrument on the right hand, as well as abraded areas on Maria's wrist.

Dr. Teas then testified concerning her findings upon an internal examination of Maria's skull and head area. Maria suffered multiple fractures of the skull as well as a large amount of subgaleal hemorrhage, which Dr. Teas described as a hemorrhage inside the scalp. Dr. Teas testified in detail concerning the numerous fractures suffered by Maria, including: a fracture on top of the skull; a fracture which extended forward into the forehead region, in a v-shaped form; and a fracture that extended from above Maria's ear all the way to the back of her head, with two portions of the fractured area having been displaced. Dr. Teas additionally testified to fractures found inside Maria's skull, including a large fracture extending in a semi-circular fashion. Dr. Teas related that the portions of the skull which support the nose, right eye, and left inner ear had all suffered fractures. Dr. Teas opined that a considerable amount of force would be necessary to cause these types of fractures. Dr. Teas concluded her recitation of Maria's specific injuries by noting that in addition to the numerous fractures, Maria's brain suffered a subarachnoid hemorrhage. Dr. Teas then related her finding that the cause of Maria's death was craniocerebral injuries due to blunt and sharp force injury, and testified that a crowbar would be consistent with causing the type of injuries suffered by Maria.

The State also called Tom Richardson, who testified that he met defendant in high school in 1989, and worked together with defendant for a short time in 1992. Richardson stated that he became acquainted with Maria in the fall of 1992 when he met her at the Grafs' apartment during his visits to defendant. Richardson testified that on October 31, 1992, he had visited defendant at the Grafs' condominium, and during a conversation in defendant's room, defendant told Richardson that defendant was going to hit Maria over the head with a crowbar, rape her, and take off to New York City in her car. Defendant told Richardson that defendant would attack Maria upon her exit from the bathroom of the apartment, which was located between defendant's room and the Grafs' bedroom. During this conversation, defendant also showed Richardson a crowbar, which defendant retrieved from his dresser, one end of which had been wrapped in black electrical tape. Defendant at that time also told Richardson that he wanted to ask Maria out but that she probably would laugh at him because he was short.

Richardson testified that he had two other conversations with defendant in which defendant mentioned his plan to attack Maria. According to Richardson, in April 1993, as he and defendant were driving in Richardson's truck, defendant again stated that he planned to hit Maria over the head with the crowbar, rape her, and steal her car to escape to New York City. Defendant repeated these statements to Richardson once again in May 1993.

Richardson testified that on August 15, 1993, Detective Van Stedum came to talk to him regarding Maria's murder, and it was at that time that Richardson told the police about the conversations he had with defendant concerning Maria. Richardson then went with Detective Van Stedum to a hardware store to show the detective the type of crowbar that defendant had shown Richardson in defendant's room. On cross-examination, Richardson admitted that he did not previously go to the police concerning the conversations he had with defendant about Maria, nor did he ever inform Maria about defendant's statements. Richardson testified that he remained silent because at the time he thought defendant was only joking.

The sole witness called by defendant during the eligibility phase was Detective Michael Simo, and the sole inquiry of the detective was a conversation Simo had with Susan Graf the day after Maria's murder. Detective Simo testified that Susan told him that defendant wanted to purchase a small quantity of marijuana from Maria, but that Maria would not give it to him until he paid the Grafs the money that he owed them on his bills.

Following arguments by counsel, the jury found beyond a reasonable doubt that defendant was eligible for the death penalty in that he was 18 years of age or older at the time of the murder and that four statutory aggravating factors existed: (1) commission of first degree murder in the course of an aggravated criminal sexual assault (720 ILCS 5/9–1(b)(6) (West 1994)); (2) commission of first degree murder in the course of an armed robbery (720 ILCS 5/9–1(b)(6) (West 1994)); (3) commission of first degree murder during the course of a robbery (720 ILCS 5/9–1(b)(6) (West 1994)); and (4) commission of the murder in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a life by unlawful means (720 ILCS 5/9–1(b)(11) (West 1994)).

At the aggravation and mitigation phase of the sentencing hearing, the State presented 25 witnesses in aggravation. In mitigation, the defense called five witnesses and defendant elected to speak in allocution. The majority of the State's evidence in aggravation concerned defendant's criminal record. The State first called Detective Michael Simo, who informed the jury that while defendant was in New York City, defendant had been arrested for disorderly conduct and possession of marijuana. Defendant pled guilty to the marijuana charge and was fined $50, while the disorderly conduct charge was dropped. Defendant never returned to court to pay the $50 fine. Detective Simo testified that defendant informed him about defendant's history of committing burglaries in the Chicago suburban area, including burglaries at suburban recreational vehicle dealers, public storage facilities, and trucking firms. Defendant also told Detective Simo he stole money from the piggy bank of the Grafs' daughter.

The State then presented numerous witnesses, including friends of defendant and law enforcement officers, who testified regarding the burglaries committed by defendant. The evidence indicated that defendant staked out various businesses in order to assess whether they presented good prospects for a burglary, and then related this information to his friends in an effort to induce them to join him in the burglary. Because these burglaries remained unsolved, no arrests were made and no charges were filed against defendant in connection with these crimes. In one instance, however, defendant was arrested when he and three friends attempted to burglarize a public storage facility in Bensenville. Craig Grude, a sergeant with the Bensenville police department, testified that defendant provided a handwritten statement confessing that the burglary had been planned and that defendant was involved. However, defendant was not charged in connection with this incident.

Robert Budig, an officer with the Villa Park police department, testified that he stopped a pickup truck containing defendant and two friends. In the bed of the pickup truck, the officer discovered numerous items which had been reported stolen from a Wisconsin campground. Michael King, a sergeant with the Villa Park police department, also responded to the traffic stop and upon a search of the truck's cab recovered spent .380-caliber shell casings, narcotics paraphernalia, and a .380 semiautomatic from between the front seats. All three individuals were transported to the police station, where defendant was charged with felony theft. Upon being placed in a jail cell, defendant was observed throwing a plastic bag containing a green leafy substance into the cell's urinal. Officer Budig retrieved the bag, field tested the bag's contents, and additionally charged defendant with possession of cannabis. Defendant was convicted of felony theft and sentenced to 24 months' probation.

Next, the State introduced testimony concerning defendant's commission of thefts from his employers. Genaro Esposito, a police officer with the Villa Park police department, testified that in July 1990 he investigated a theft from Olympus Auto Parts, a store where defendant was employed at that time. The owner informed police that $1,050 was missing from a bank bag which the owner placed in a desk drawer in his office. The owner notified police, and Officer Esposito phoned defendant's residence and informed defendant's father that defendant was a suspect in the theft. During this conversation, defendant arrived home and denied he was involved in the theft. However, after being induced by his father to tell the truth, defendant admitted that he stole the money and returned $400 to the owner, stating that he had already spent the balance. The owner decided not to prosecute defendant on the condition that defendant would return the remainder of the missing money.

Steven Kowalewski, a controller for National Plan Service, testified regarding defendant's employment with that company in 1992. Kowalewski stated that defendant's duties including working in the warehouse and delivering the mail on a daily basis, which allowed defendant access to the firm's minivan. On August 3, 1992, the minivan was discovered missing, and sometime thereafter it was found abandoned in Cicero, Illinois. Kowalewski testified that although he received an anonymous call that defendant had stolen the van, no charges were filed against defendant in connection with the missing van. However, two of defendant's friends, Daniel Kapellen and Tom Richardson, testified that defendant admitted to them that he had stolen the van. Richardson further testified that in September 1992, defendant told Richardson that he had duplicated the van's key and would routinely take the van after work on Fridays and return it before the weekend was over. Defendant stated to Richardson that defendant had to leave the van in Cicero because on one of his outings the van had a flat tire which he was unable to change.

The State also called several witnesses to testify regarding defendant's conduct and attitudes towards women. Detective Simo testified that defendant told him that while defendant was in New York City, on at least two occasions defendant had thought about hitting two different women over the head and raping them. Mark Heuser, a friend of defendant, testified that defendant often spoke about torturing women, and that defendant was the only one in their circle of friends to make such comments. Another friend of defendant, Daniel Kapellen, testified to conversations with defendant wherein defendant spoke in detail of sexually abusing and torturing defendant's former girlfriend. Kapellen also testified to various other conversations he had with defendant wherein defendant detailed plans to assault and rape other women. Defendant told Kapellen that defendant already owned a crowbar and that defendant had taped one end for a handle. According to Kapellen, defendant stated that he kept the crowbar at home and sometimes in his backpack. The State also called Tom Richardson, who testified that in addition to the specific conversations with defendant concerning Maria in April and May of 1993, defendant also spoke in general terms concerning his desire to kill and rape other women.

Cynthia Ledlow, another friend of defendant, testified that in the spring of 1989, defendant asked her to go on a drive to Springfield. Thereafter, Mark Heuser and his brother approached her and told her that defendant planned to rape her if she went to Springfield with him and then throw her body in a field. Consequently, she refused to accompany defendant.

The State also called Roshanna Tokh, who testified that in June 1984, when she was five years old, defendant assaulted her. Defendant, who was approximately 12 years old at the time, was questioned by the police and subsequently released into his mother's custody.

The State then introduced evidence of defendant's conduct while he was incarcerated in the Du Page County jail, awaiting trial in this matter. Nikki Cokinis, a deputy for the Du Page County sheriff's department, testified that in the fall of 1994, she transported defendant on two or three occasions from the jail to a holding cell in the courthouse for his court appearances. Deputy Steven Smith testified that in October 1994, he was escorting defendant to the courthouse when defendant asked Smith if Deputy Cokinis could escort him to the courtroom. In November 1994, while escorting defendant, Deputy Smith testified that defendant inquired whether Smith could handcuff defendant and Deputy Cokinis together and send them up in the elevator to court. Thereafter, Deputy Smith informed Deputy Cokinis about defendant's comments and requested that Cokinis no longer escort defendant to and from court. Further, Deputy Smith testified that his superior, Chief Smith, circulated a memo on November 22, 1994, in reference to a statement made by defendant that he was going to rape a female in the courthouse if he received a long sentence. After the memo was circulated, female bailiffs were no longer allowed to escort defendant.

Thomas Hughes testified that in the fall of 1994, while he was at Du Page County jail awaiting trial on a retail theft charge, he became familiar with defendant, who was housed in the same jail pod. Hughes testified that in November 1994, he and defendant were watching television in a common area of the pod when a female appeared on the screen. According to Hughes, defendant stated that he wanted to hit her over the head with a cinder block and have sexual intercourse with her afterwards. Hughes further testified that on another occasion, defendant stated that if it were possible, defendant wanted to throw Deputy Cokinis to the ground, take her panic button from her, get her out of the camera's view, and rape her. According to Hughes, defendant stated that he would attack Cokinis in the holding cell, that defendant thought it would be fairly easy to overpower her, and that defendant wanted to take advantage of the opportunity because it would probably be his last chance of having sex or contact with a woman. Finally, Hughes related to the jury that defendant spoke to him concerning Maria's murder. Defendant told Hughes that defendant felt that Maria owed him something and she was not going to give it up, so defendant had to resort to physical violence. Defendant used vulgarities to refer to Maria, and defendant showed Hughes Maria's autopsy reports.

The final witness for the State was Maria's father, Jovan Djordjic, who read into evidence a victim impact statement. After he testified, the State rested.

Defendant called five witnesses in mitigation. Dr. Carl Wahlstrom, a board-certified expert in forensic psychiatry, testified that prior to meeting with defendant, he spent approximately 10 hours reviewing a wide array of records pertaining to defendant, including defendant's school records, psychological and psychiatric records, drug-treatment records, and work records. In addition, Dr. Wahlstrom reviewed details regarding defendant's arrest and confession, as well as the police reports and the autopsy records. Dr. Wahlstrom testified that he examined defendant over a three-day period, for a total of less than eight hours.

Dr. Wahlstrom testified that, in his opinion, at the time of the murder defendant was not out of touch with reality. However, based upon his examination of defendant's drug-treatment records and his conversations with defendant, Wahlstrom concluded that defendant suffered from dependence on PCP, cocaine, LSD, and marijuana. Wahlstrom related that defendant stated that subsequent to inflicting the blows to Maria's head, defendant hallucinated that he saw snakes and bugs on Maria's face. Based upon defendant's description of these hallucinations, Wahlstrom believed that at the time of the murder defendant was under hallucinogen intoxication with perceptual disturbances.

Dr. Wahlstrom also testified that he diagnosed defendant as having an antisocial personality disorder, characterized by a disregard for the rights of others. Wahlstrom testified that there were indications of this disorder during defendant's childhood, including defendant's talking back to teachers, threatening teachers, setting fields on fire, and displaying cruelty to animals. As an adult, defendant evidenced periodic failures to conform to social norms with respect to lawful behavior, had indications of impulsivity, and failed to plan ahead. Defendant also showed reckless disregard for the safety of others, as evidenced by the driving of a car while intoxicated, as well as repeated failure to follow and honor financial obligations.

Dr. Wahlstrom also diagnosed defendant as having a borderline personality disorder, characterized by a disturbed view of one's self-image. This disorder, according to Wahlstrom, involves very unstable relationships with others, an unstable mood, and impulsivity. Defendant met the criteria by engaging in frantic efforts to avoid real or imagined abandonment, and showed impulsivity in spending, sex, substance abuse and reckless driving. Defendant also evidenced recurrent suicidal behavior, inappropriate intense anger or difficulty controlling his anger, and fantasies of hurting other individuals.

Dr. Wahlstrom stated that defendant had an avoidant personality disorder, characterized by feelings of inadequacy, social inhibition, and hypersensitivity to negative evaluations of others. As a result, defendant showed restraint with intimate relationships because of his fear of being shamed or ridiculed, and defendant was preoccupied with being criticized and rejected in social settings, viewing himself as being socially inept, personally unappealing, and inferior to others. Wahlstrom related that defendant's sole dating relationship occurred at age 15, and defendant patronized prostitutes because that was the only sexual intimacy that he felt he could accomplish.

Dr. Wahlstrom further testified that family dysfunction affected defendant's self-image. There was marital stress between defendant's mother and father, who divorced when defendant was 12, and there was differential dislike by defendant's mother, who treated defendant differently than his siblings. For example, Wahlstrom related that defendant's mother would kiss defendant's brother while ignoring defendant, thereby pushing defendant away emotionally, and hindering his development of good self-esteem. However, Wahlstrom acknowledged that defendant was neither physically nor sexually abused as a child.

In addition, Dr. Wahlstrom testified that at the time of the murder, defendant was under the influence of an extreme mental or emotional disturbance, due to various emotional stresses including the disruption of defendant's family, the failure of in-

patient drug and mental health treatment, constant job losses, defendant's history of arrests, defendant's impending eviction from his residence, and acute feelings of rejection due to Maria's spurning of defendant's sexual advances. Dr. Wahlstrom testified that defendant fantasized that he had a real relationship with Maria, and on the day of the murder he was building up his courage to ask her for a sexual relationship, which she declined. According to Wahlstrom, this fantasy, Maria's rejection, and defendant's poor self-esteem combined to result in an “experience of extreme rage and a feeling of a culmination of all the mistreatment regarding everyone who he felt didn't think him to be any good, and I think that at that moment in time the culmination of all these caused him to have – to commit a senseless, irrational act.”

In regards to defendant's fantasies of torturing women, Dr. Wahlstrom stated that it is only through the fantasies that defendant can realize total power and control. Dr. Wahlstrom acknowledged that defendant has a “chronic history” of violent fantasies towards women, and additionally related that while defendant was awaiting trial in this matter, defendant had made a comment in reference to a television program where a girl was found murdered. Defendant stated to his fellow inmates that because the girl had only been murdered and not raped, it was a “waste of a good body.”

Dr. Wahlstrom opined that defendant could be treated in a secured institution, but defendant would have to cooperate and avail himself of the treatment, something defendant had refused to do in the past. Wahlstrom acknowledged that defendant has an inability to experience a feeling of remorse due to defendant's antisocial personality disorder, and concluded that because of defendant's feelings of inadequacy defendant can have only a very limited emotional attachment with other human beings. When asked if defendant is a dangerous person, Dr. Wahlstrom replied, “I think he has shown himself to be a dangerous individual.”

On cross-examination, Dr. Wahlstrom related that defendant's only thoughts immediately after he killed Maria and left for New York City was that it was too late to change anything; defendant had no thoughts concerning Maria. Also during cross-examination, Dr. Wahlstrom admitted that defendant told him that defendant wanted to have sex with Maria “before she got cold and stiff,” that defendant was satisfied with his life after the murder, and that defendant's life at the Du Page County jail had been “great.”

Finally, the State questioned Dr. Wahlstrom during cross-

examination concerning defendant's truthfulness regarding his drug use, since in all testing done from August 19, 1991, through June 20, 1994, by the Du Page County probation department, defendant never tested positive for PCP or cocaine, and only tested positive for marijuana use. Defendant also told his probation officer that he stopped using PCP in 1990. Wahlstrom admitted that he was aware of these reports, but that they did not change his opinion regarding defendant's drug dependence on the night of the murder. The State questioned Dr. Wahlstrom concerning a probation report wherein defendant said that his family life was good because defendant had a good relationship with his mother, father, stepmother and siblings. Again, Wahlstrom stated that this fact would not change his opinions.

The next witness called by the defense in mitigation was Robin Boothby, a probation officer with the division of adult special services in Du Page County, who prepared a presentence report detailing defendant's criminal history. Defendant's first arrest was in April 1989 for unlawful possession of cannabis, and resulted in defendant's paying a fine. In September 1990, defendant was arrested for driving under the influence and sentenced to court supervision with the condition that he complete drug counseling. This supervision was subsequently revoked along with defendant's driver's license. In April 1991, defendant was arrested for driving with a suspended license, and again sentenced to court supervision. Due to defendant's noncompliance with the conditions of supervision, the supervision was revoked. After being convicted of theft on August 19, 1991, defendant was placed on probation for a period of 24 months, with the condition that he complete outpatient drug-treatment counseling. Defendant failed to comply with the counseling requirement, was found in violation of his probation, and was sentenced to 14 days in the Du Page County jail. Shortly thereafter, defendant was again found in violation of probation due to noncompliance with drug counseling and a second petition to revoke defendant's probation was filed. The witness further indicated that drug screenings performed on defendant in January 1992 and July 1993 were positive only for cannabis.

Donald Knoll, a sergeant in the Du Page County sheriff's department, was the next witness called by the defense in mitigation. Knoll testified that defendant was the subject of 12 jail incident reports since defendant arrived in the jail in June 1994. These reports included several incidents of damage to property, disorderly conduct, disrespect of jail guards, abusive language, and failure to follow orders. Five of these incidents resulted in defendant's being placed in disciplinary segregation. Knoll also testified that special rules in regards to defendant are in place prohibiting female guards from escorting defendant in order to assure the guards' safety.

Defendant testified that he grew up in a house in suburban Elmhurst, and that his everyday life as a child was not really happy because he did not have many friends and was constantly fighting with his brother and sister. According to defendant, he did not have a good relationship with his mother, who gave defendant far less attention than his siblings. Defendant also stated that his mother beat him with a shoe, chased him with a knife, and on one occasion threw scissors at him after defendant had hit his brother, causing his mother to leave her job and come home from work early. Defendant stated that he moved out of the family home and into the Grafs' residence because his mother remarried and her husband did not get along with defendant. However, defendant also related that on two occasions when he was behind in his rent payments to the Grafs, his mother gave him $260 to cover his expenses.

On cross-examination, defendant stated that he had a good relationship with his father and that defendant believed that he was his father's favorite child. Defendant also admitted that he told the probation department in August 1994 that he had a good relationship with his mother, father, stepmother and siblings. During cross-examination defendant acknowledged that his parents had arranged for counseling; defendant refused to accept that help and informed his parents that drug treatment was a waste of time because he intended to return to drug usage.

Defendant further testified on cross-examination that “[i]t wasn't a choice” to murder Maria; instead, “[i]t was something that happened.” Defendant agreed that his main objective after inflicting the blows to Maria's head was to rape her before she became cold and stiff. Defendant further admitted on cross-

examination that he could hear the life leaving Maria's body as he raped her the first time, and he placed the pillow over her head when he returned from the pawn shop because he was hallucinating that there were snakes on her face. Defendant also admitted on cross-examination that he has thought about hitting women over the head since murdering Maria, and that he wanted to rape Deputy Cokinis.

The last witnesses to testify in mitigation were defendant's parents, Eugene Macri and Kathleen Koutsogiannis, who related that their marriage had been in trouble since defendant was two years old, and that many arguments and instances of violence occurred in the household. Defendant's parents also related that they placed defendant in treatment but that defendant refused to continue with the programs. Defendant's father testified that defendant's mother scolded defendant more harshly than their other children and, in his opinion, defendant's mother never liked defendant. Defendant's father additionally related that he and defendant had a good relationship and that they would do many activities together, including going to shows and participating in Little League. Defendant's mother testified that her relationship with defendant was not close, and that she never took an interest in him the way that she did with her other children. She testified that during defendant's childhood, she belittled him by telling him he was stupid, no good, and short. She related that defendant shared a bedroom with his brother, and when she came home, she would kiss defendant's brother but never defendant.

After closing arguments, the jury returned a verdict finding no mitigating factors sufficient to preclude the imposition of the death penalty. Defendant was sentenced to death. All post-trial motions were denied. This appeal followed.

ANALYSIS

Defendant's appeal to this court is limited solely to alleged errors committed by the trial court during his sentencing proceeding. Defendant asserts numerous claims of error at both phases of his sentencing hearing, and argues that each of these claimed errors requires that he be given a new sentencing hearing.

I. Eligibility

Jury Selection

Defendant raises two issues concerning the selection of a jury for the sentencing phase of his trial. Defendant first contends that his constitutional rights to due process of law and freedom from cruel and unusual punishment were violated because the trial court refused to pose three tendered questions to prospective jurors during 
voir dire
 questioning. In the alternative, defendant asserts that the trial court's refusal to ask these questions constitutes an abuse of discretion. Defendant tendered to the trial judge three 
voir dire
 questions to inquire of potential jurors whether, if they should determine that a death sentence was not appropriate, they could withstand pressure from their cojurors during deliberation and stand alone against imposition of a death sentence. The following are the proffered questions:

“(1) Question #114: Will you be able to consider all the evidence presented? In the event you are to consider this question, you would have to vote unanimously for death. But if any one of you were against death, you could so vote alone and stop the entire proceeding. Would you be able to stand alone this way?

(2) Question #115: If your fellow jurors did not agree with you that some fact mitigates outweighs [
sic
] aggravation or that the sum of the mitigation outweighs aggravation, could you vote alone against death?

(3) Question #116: If there were another juror who did not want to impose death, would you respect that other juror's opinion?”
(footnote: 1)
 The trial court ruled that only the first sentence of question No. 114 (“Will you consider all the evidence presented?”) would be asked at 
voir dire
, and declined to ask the remainder of question No. 114 as well as question No. 115 and No. 116. The record reveals that the trial judge based this decision on her belief that all three questions covered the same issue, and that these questions related to the jurors' deliberation process, a matter the trial court indicated was properly within the province of predeliberation jury instructions. Further, the trial judge specifically ruled that she did not “think it[ ] appropriate to single out some aspects of the [jury] instructions and not others.”

Defendant contends that the purpose of the three proffered questions was to determine a potential juror's “bias” or “prejudice” towards the statutory requirement of section 9–1(g) of the Criminal Code of 1961 that a jury's determination that the death penalty should be imposed must be unanimous. 720 ILCS 5/9–1(g) (West 1994). Defendant argues that he has a constitutional right to inquire whether a potential juror could be swayed by the majority of cojurors during deliberations and not vote his or her conscience in a death penalty case. Based upon this contention, defendant concludes that he was denied his constitutional right to an impartial jury.

In support of his argument, defendant relies upon 
Morgan v. Illinois
, 504 U.S. 719, 119 L. Ed. 2d 492, 112 S. Ct. 2222 (1992). In 
Morgan
, the Supreme Court held that a defendant is constitutionally entitled to inquire at 
voir dire
 whether prospective jurors would automatically impose the death penalty to the same extent that the State may inquire of prospective jurors pursuant to 
Witherspoon v. Illinois
, 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770 (1968), whether they would automatically vote against the death penalty. In 
Morgan
, the defendant tendered the following question to the trial court to be asked of prospective jurors on 
voir dire
: “If you found [the defendant] guilty, would you automatically vote to impose the death penalty no matter what the facts are?” 
Morgan
, 504 U.S. at 723, 119 L. Ed. 2d at 499, 112 S. Ct. at 2226. The trial court refused the defendant's request, on the basis that it believed that it had asked the question “in a different vein substantially in that nature.” 
Morgan
, 504 U.S. at 723, 119 L. Ed. 2d at 499, 112 S. Ct. at 2226.

 In determining that the trial court's refusal to ask the question proffered by the defendant violated defendant's due process rights to an impartial jury, the Supreme Court held that in a capital case, the trial court is constitutionally required, if requested by the defendant, to ask potential jurors during 
voir dire
 whether they would automatically vote for the death penalty if the defendant were convicted of murder. The Court based its ruling on the reasoning that “[a] juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do.” 
Morgan
, 504 U.S. at 728-29, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229. The Supreme Court reasoned that “because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror.” 
Morgan
, 504 U.S. at 728-29, 119 L. Ed. 2d at 502-03, 112 S. Ct. at 2229.

This court has previously read 
Morgan
 in a narrow context, observing that “
Morgan
 held only that the defendant is entitled to have potential jurors questioned as to whether they would 
automatically
 vote to impose the death penalty upon a finding of guilt, 
without regard
 to the aggravating or mitigating circumstances present in the case.” (Emphasis in original.) 
People v. Hope
, 168 Ill. 2d 1, 29 (1995). As we noted in 
Hope
, “
Morgan
 specifically directed its holding toward the end of discovering jurors for whom `the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant.' ” 
Hope
, 168 Ill. 2d at 29-30, quoting 
Morgan
, 504 U.S. at 729, 119 L. Ed. 2d at 502-

03, 112 S. Ct. at 2229; see also 
People v. Jackson
, 182 Ill. 2d 30, 59-60 (1998) (similarly narrowly construing the 
Morgan
 holding).

In the case at bar, defendant argues that jurors “who could not follow their own consciences when challenged by other jurors *** are conscienceless jurors who cannot follow the law or their oath.” Defendant concludes that, based upon the rationale of 
Morgan
, 
voir dire
 questions inquiring whether a juror can “stand alone” and vote his or her conscience against all the remaining jurors is likewise constitutionally compelled.

We find defendant's reliance upon 
Morgan
 misplaced. 
Morgan
 focused its inquiry upon those prospective jurors who “had predetermined the terminating issue of [defendant's] trial, that being whether to impose the death penalty.” 
Morgan
, 504 U.S. at 736, 119 L. Ed. 2d at 507, 112 S. Ct. at 2233. In the cause at bar, we find that there is no correlation between the inquiry proposed by defendant's tendered 
voir dire
 questions and defendant's assertions that the questions serve to detect bias or prejudice within the meaning of the 
Morgan
 decision.

We agree with the trial judge's assessment that the three questions tendered by defendant concern matters relating to the jury-deliberation process and, therefore, were properly covered by the trial court during the jury instruction phase of trial. The record reveals that the trial judge appropriately instructed the jurors at both the eligibility phase and the aggravation-mitigation phase of defendant's sentencing hearing concerning the unanimity requirement. At eligibility, the trial judge gave the jury the following instructions, substantially tracking Illinois Pattern Jury Instructions, Criminal, No. 7B.01 (3d ed. 1992) (hereinafter IPI Criminal 3d):

“If you cannot unanimously decide that the defendant is eligible for a death sentence under the law, then there will be no second part of the death penalty hearing. The court will impose a sentence other than death.

If you unanimously decide that the defendant is eligible for a death sentence, then we will go to the second part of the hearing.”

Similarly, at the aggravation-mitigation stage, the jury was provided with two verdict forms and the trial court judge gave the jurors the following instructions, substantially tracking IPI Criminal 3d No. 7C.05:

“If you unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude the imposition of a death sentence, then you should sign the verdict requiring the court to sentence the defendant to death.

If you do not unanimously find from your consideration of all the evidence that there are no mitigating factors sufficient to preclude imposition of a death sentence, then you should sign the verdict requiring the court to impose a sentence other than death.

* * *

You may not sign a verdict imposing a death sentence unless you unanimously vote for it.”

The jury in this case was therefore clearly instructed that a sentence of death could be imposed only if the jurors unanimously decided that defendant was eligible for death and that there were no mitigating circumstances sufficient to preclude imposition of the death penalty.

In his brief to this court, defendant points out that the court asked the prospective jurors questions concerning 11 different areas, including inquiry into any biases and prejudices the prospective jurors had in conjunction with the standards set forth in 
Witherspoon
 and 
Morgan
. To this end, the trial court judge questioned the prospective jurors regarding any religious, moral or personal beliefs they might have against the imposition of the death penalty, whether the jurors could determine facts based upon the evidence presented and then follow the law as instructed, and whether the jurors would automatically vote to impose death in every murder conviction. Although defendant uses this series of questions as a basis for his argument that none of the questions asked at 
voir dire
 constituted an adequate substitute for the three tendered questions, this series of questions underscores that the trial court's inquiry assured that those jurors who would ignore all of the aggravating and mitigating circumstances were discovered. In sum, we find that the trial court's refusal to ask the three 
voir dire
 questions tendered by defendant did not deprive defendant of his constitutional rights and thus does not warrant reversal.

Defendant also argues that the trial court's refusal to ask his three tendered questions violates the holding of 
People v. Zehr
, 103 Ill. 2d 472 (1984). In 
Zehr
, this court examined Supreme Court Rule 234 (134 Ill. 2d R. 234), which is made applicable to criminal cases by Rule 431 (134 Ill. 2d R. 431). At that time, rule 234 provided:

“The court shall conduct the 
voir dire
 examination of prospective jurors by putting to them questions it thinks appropriate touching their qualifications to serve as jurors in the case on trial. The court may permit the parties to submit additional questions to it for further inquiry if it thinks they are appropriate, or may permit the parties to supplement the examination by such direct inquiry as the court deems proper. Questions shall not directly or indirectly concern matters of law or instructions.”

The noncapital defendant in 
Zehr
 had tendered 
voir dire
 questions to the court concerning the presumption of innocence, the State's burden of proof, and the right of the defendant not to testify. The 
Zehr
 trial court refused to ask the submitted questions, determining that the proposed questions violated the provisions of Supreme Court Rule 234 to the extent that such questions may neither directly nor indirectly concern matters of law or jury instructions. This court, in reversing defendant's convictions of home invasion, burglary, and battery, held that the trial court's refusal to ask the questions resulted in prejudicial error. The 
Zehr
 court observed that “essential to the qualification of jurors in a criminal case is that they know that a defendant is presumed innocent, that he is not required to offer any evidence in his own behalf, that he must be proved guilty beyond a reasonable doubt, and that his failure to testify in his own behalf cannot be held against him. If a juror has a prejudice against any of these basic guarantees, an instruction given at the end of trial will have little curative effect.” 
Zehr
, 103 Ill. 2d at 477. This court further observed in 
Zehr
 that each of the defendant's tendered questions went “ `to the heart of a particular bias or prejudice which would deprive defendant of his right to a fair and impartial jury' [citation], and although they need not have been asked in precisely the form submitted, the subject matter of the questions should have been covered in the course of interrogation on 
voir dire
.” 
Zehr
, 103 Ill. 2d at 477.

In the cause at bar, defendant does not contend that the prospective jurors had a bias or prejudice against any of the basic guarantees enumerated in 
Zehr
. Instead, defendant reiterates the argument raised in connection with his constitutional challenge that his proposed inquiry into whether a juror would be able to “stand alone” in a no-death decision allows defendant to detect any bias or prejudice concerning the venireperson's ability to apply the unanimity rule, a rule which defendant contends is as fundamental to every capital sentencing hearing as are the rules discussed in 
Zehr
. We reject defendant's argument and repeat our holding above that the three questions proffered by defendant at 
voir dire
 are unrelated to juror prejudice or bias; rather, the questions concern jury instructions, a matter precluded from 
voir dire
 inquiry under Rule 234, which specifies that “questions shall not directly or indirectly concern matters of law or instructions.” Accordingly, the trial court did not err in refusing to ask defendant's three tendered questions at 
voir dire
.

Defendant's second claim of error concerning the selection of the jury for his sentencing determination is that the trial court improperly barred the defense from inquiring at 
voir dire
 whether a prospective juror would be able to hold the State to its burden of proving eligibility beyond a reasonable doubt. Venireperson Barbara Wettstaedt, who ultimately became a juror and deliberated upon defendant's sentence, was asked the following at 
voir dire
:

“DEFENSE COUNSEL: You realize that during the first phase, the eligibility part, that the State has the burden of proof?

THE PROSECUTOR: I'm going to object.

THE COURT: Sustained. It's been asked and answered.

DEFENSE COUNSEL: Let me rephrase that. Would you hold the prosecution to its burden of proving beyond a reasonable doubt that a murder has been committed, that aggravating factors exist for eligibility?

THE PROSECUTOR: I would object because he's already been found guilty of murder.

THE COURT: I'll sustain that.

DEFENSE COUNSEL: Will you wait to hear all the evidence before forming an opinion as to whether the prosecution has proven or met its burden for eligibility?

VENIREPERSON WETTSTAEDT: Would you repeat that please?

* * *

Yes, sir.

DEFENSE COUNSEL: And you'll try to be fair to both the prosecutors and the defense in this case?

VENIREPERSON WETTSTAEDT: Yes, sir.

DEFENSE COUNSEL: Now, if you feel that the prosecutor has not met their burden would you have any problem with finding Mr. Macri ineligible at the first phase?

VENIREPERSON WETTSTAEDT: Would you repeat?

* * *

And to go along with the Judge's sentencing[?]

DEFENSE COUNSEL: Well, after that the sentencing would be up to the judge.

VENIREPERSON WETTSTAEDT: Yes.

DEFENSE COUNSEL: If they have not met their burden in the first stage, would you have any problems in finding him not eligible?

VENIREPERSON WETTSTAEDT: No sir, I will not.”

Defendant asserts that he was denied a fair sentencing hearing as a result of the trial court's ruling sustaining the prosecutor's objection to defense counsel's questions regarding whether the venireperson could hold the State to its burden of proof beyond a reasonable doubt. Defendant argues that counsel's question had not been previously asked and answered because counsel's earlier questions of this prospective juror merely referred to the burden being on the prosecution, and never specifically referred to the standard of proof as being beyond a reasonable doubt. Further, defendant contends that the court's questioning did not inquire of the prospective juror whether she would be able to hold the State to the beyond a reasonable doubt burden as to eligibility. Although defendant acknowledges that the court had advised the jury panels that at the eligibility phase the State was required to prove defendant's eligibility for the death sentence beyond a reasonable doubt, defendant contends that counsel's question was focused upon ascertaining the juror's bias or inability to determine defendant's eligibility based upon proof beyond a reasonable doubt, thereby violating defendant's due process rights.

Defense counsel accepted venireperson Wettstaedt as a juror. It is well established that the failure of defense counsel to challenge a juror for cause or by peremptory challenge waives any objection to that juror. 
People v. Coleman
, 168 Ill. 2d 509, 546-47 (1995); 
People v. Collins
, 106 Ill. 2d 237, 271 (1985).

Defendant, however, urges us to consider his claim for relief under the plain error doctrine. 134 Ill. 2d R. 615(a). Under the doctrine of plain error, a reviewing court may consider an error not properly preserved at trial where the evidence is closely balanced or the error was so fundamental and of such magnitude as to deny the defendant a fair trial. 
People v. Miller
, 173 Ill. 2d 167, 191-92 (1996). We do not believe that either of these circumstances applies to defendant's claim.

In his brief to this court, defendant acknowledges that all venire panels were told the following by the trial court: “In this case, the State must prove the defendant eligible for the death penalty beyond a reasonable doubt. That is their burden and it will remain with them throughout that phase.” Furthermore, during 
voir dire
, venireperson Wettstaedt was asked by defense counsel whether she understood that the sentencing determination consisted of two separate parts, and that during the first phase the State carried the burden to establish eligibility. She responded that she had no “problems or preconceptions” with that concept, and that she would wait to hear all the evidence before deciding whether the State had “met their burden for eligibility.” Further, venireperson Wettstaedt responded that she would have no difficulty in finding defendant ineligible for a sentence of death if the State failed to meet its burden. Thus, the record establishes that venireperson Wettstaedt was aware prior to being empaneled that the State had the burden of proving defendant eligible for the death penalty beyond a reasonable doubt and that she was willing to hold the State to that burden. Defendant is unable to point to anything in the record to indicate that venireperson Wettstaedt disagreed with this proposition or was in any aspect biased or prejudiced. Accordingly, the court's ruling did not constitute plain error.

Trial Court's Refusal to Exclude Portions of Defendant's

 Confession

Defendant next argues that he was denied a fair eligibility hearing due to the trial court's failure to grant a motion 
in limine
 to redact portions of defendant's confession, an error which defendant contends was compounded by Detective Van Stedum's “inaccurate and misleading” characterization of the confession as containing an admission of defendant's previous intent to assault other women with a crowbar and rape them, thereby tainting the jury with “speculative” other-crimes evidence which was substantially prejudicial and unfair.

Prior to the eligibility phase, the defense moved 
in limine
 to exclude or redact from defendant's confession any statements regarding defendant's thoughts involving hitting women over the head with a crowbar on the Illinois Prairie Path. The trial judge denied this motion, allowing the State to introduce evidence “into why [defendant] procured the crowbar, that he procured it, that it was prior to these events.” The trial judge further ruled that “[t]he crowbar and the conversation about the crowbar, any statements about the crowbar, that is probative and its very relevant and it should come in.” Defendant unsuccessfully renewed the motion to redact the confession after 
voir dire
 was concluded.

Detective Van Stedum on direct examination was asked to describe the contents of defendant's confession of June 10, 1994, in which defendant described a crowbar he owned. The following occurred:

“THE PROSECUTOR: Did you ask him anything further about when he purchased the crowbar?

DET. VAN STEDUM: I did. I asked him when he purchased it. He advised that a few years back he had worked at NPS, which was National Plan Service in Elmhurst. He had gotten fired from there and was pretty upset. He went to a hardware store in Villa Park. He bought it there. He took it to the Prairie Path. He was going to knock a girl over the head and rape her on the Prairie Path.

DEFENSE COUNSEL: Objection, Judge.

THE COURT: It will be sustained.

DEFENSE COUNSEL: Ask that it be stricken.

THE COURT: It will be.

THE PROSECUTOR: Can I ask for a basis?

(A side-bar was held, which was not made a matter of record)

THE COURT: Objection stands.”

After this exchange, the audio tape of defendant's confession was played for the jury, and contained the following:

“DET. SIMO: And why did you buy that [crowbar]?

DEFENDANT: For protection and for, you know, `cause I–I was–the year before I was, you know, kind of planning on doing the same thing.

DET. SIMO: When you say `the same thing–'

DET. VAN STEDUM: You mean hitting a girl over the head?

DEFENDANT: Right, or taking her purse or, you know–”

Defendant contends that the references to the Prairie Path statement are “prejudicial and inflammatory” and asserts that the statement is “at worst ambiguous and, at best, says only that defendant admitted thinking about or planning to hit a girl over the head with the crowbar, not to rape but to rob.” Defendant concludes that this evidence did not bear upon any issues to be decided by the jury and only served to distract the jurors from their limited consideration of the issue of eligibility.

Defendant never objected to Detective Van Stedum's testimony in his post-trial motions. This court has held that in order for a defendant to preserve a claim of error for review, “
[b]oth
 a trial objection 
and
 a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial.” (Emphasis in original.) 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). A defendant's failure to comply with these requirements results in a waiver of that issue on appeal. 
Enoch
, 122 Ill. 2d at 186. Thus, defendant's challenge concerning this claim is waived.

We further determine that defendant's properly preserved claim concerning the trial court's failure to grant defendant's motion 
in limine
 to redact portions of defendant's confession lacks merit. We have repeatedly held that evidence having “a direct bearing on the statutory prerequisites” may be admitted at the eligibility stage. 
E.g.
, 
People v. Simms
, 143 Ill. 2d 154, 175 (1991); 
People v. Brisbon
, 106 Ill. 2d 342, 371 (1985); see also 720 ILCS 5/9–1(e) (West 1994) (“During the proceeding any information relevant to any of the [aggravating] factors *** may be presented by either the State or the defendant under the rules governing the admission of evidence at criminal trials”). Defendant's purpose in purchasing and keeping the crowbar, in conjunction with his statements to Tom Richardson concerning his intent to kill Maria, relate directly to whether the murder was “committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means.” 720 ILCS 5/9–1(b)(11) (West 1994). Thus, defendant was not prejudiced by the trial court's refusal to redact the Prairie Path statements from his confession, and no error occurred.

Prosecutor's Remarks During Rebuttal Closing Argument

Defendant next contends that he was deprived of a fair eligibility hearing in violation of his rights to due process and to be free from cruel and unusual punishment because the prosecutor remarked that by killing Maria, defendant at the same time eliminated a witness in a rape case. Defendant claims the trial court erred in overruling defense counsel's objection and allowing the same comments to be repeated at the aggravation-mitigation phase, thereby prejudicing defendant's jury with an uncharged and legally unavailable aggravating factor. During rebuttal closing argument at the eligibility stage, the prosecutor stated:

“THE PROSECUTOR: Think about this: Why was Maria Djordjic murdered? He eliminated a witness in a rape case.

DEFENSE COUNSEL: Objection.

THE COURT: It's a reasonable inference to be drawn from the evidence presented in this case.”

During the prosecutor's closing rebuttal argument during the aggravation-mitigation stage, the prosecutor similarly commented: “[Defendant] murdered her to eliminate a witness against him in a rape case.”

Defendant contends that under this court's decision in 
People v. Brownell
, 79 Ill. 2d 508, 535-36 (1980), the trial court's ruling was erroneous as a matter of law because it allowed the jury to consider a legally unavailable aggravating circumstance. Defendant additionally relies upon this court's subsequent decision in 
People v. Adams
, 109 Ill. 2d 102 (1985), where this court held a similar argument to constitute plain error and vacated the defendant's death sentence. Defendant admits that although defense counsel at trial objected to the prosecutor's remarks, the point was not preserved in defendant's post-trial motion. However, defendant contends that the trial court's ruling constitutes plain error. 134 Ill. 2d R. 615(a). In response, the State acknowledges that although the prosecutor's remarks may have been improper, the State nevertheless contends that no reversible error occurred.

We find that the two challenged comments made by the prosecutor do not constitute error under either 
Brownell
 or 
Adams
, which are factually distinguishable from the cause at bar. In 
Brownell
, the defendant was found eligible for the death penalty on two grounds: that the murdered individual was killed in the course of two other felonies, aggravated kidnapping and rape (Ill. Rev. Stat. 1977, ch. 38, par. 9–1(b)(6), now 720 ILCS 5/9–1(b)(6) (West 1994)); and that the murdered individual was an eyewitness against the defendant (Ill. Rev. Stat. 1977, ch. 38, par. 9–1(b)(7), now 720 ILCS 5/9–1(b)(8) (West 1994)). 
Brownell
, 79 Ill. 2d at 514. Section 9–1(b)(7) provided for imposition of the death sentence where “the murdered individual was a witness in a prosecution against the defendant, gave material assistance to the state in any investigation or prosecution of the defendant, or was an eye witness or possessed other material evidence against the defendant.” Ill. Rev. Stat. 1977, ch. 38, par. 9–1(b)(7).
(footnote: 2)
In 
Brownell
, this court, in construing the murdered-witness aggravating factor, determined that this statutory factor in aggravation does not allow the State to regard the slain individual as both the victim of a murder as well as a witness to the crime of his or her own murder. In reaching this conclusion, this court held that “[w]e do not think this particular factual situation was intended by the General Assembly to be included within this aggravating factor. Rather, we think the General Assembly intended to include situations where, during an investigation or prosecution of a separate offense which has previously taken place, a witness is killed in an attempt to stymie the investigation or prosecution.” 
Brownell
, 79 Ill. 2d at 525-26. Therefore, because the trial court determined that the defendant in 
Brownell
 was eligible for the death penalty on the basis of a nonexistent statutory factor in aggravation, and subsequently weighed this improper aggravating factor in reaching its decision to impose a sentence of death, this court vacated the defendant's death sentence and remanded the cause for a new sentencing hearing. 
Brownell
, 79 Ill. 2d at 535-36.

We determine that defendant's reliance upon 
Brownell
 is factually inapposite to the cause at bar. Unlike in 
Brownell
, where the defendant was improperly found eligible for the death penalty pursuant to a nonexistent statutory aggravating factor, in the cause at bar neither did the State seek to prove defendant eligible for the death sentence based upon the section 9–1(b)(8) statutory factor in aggravation, nor was the jury instructed at either stage of the sentencing proceedings regarding this aggravating factor. Defendant was found eligible for the death penalty on four grounds, none of which was the section 9–1(b)(8) aggravating factor. Further, whereas in 
Brownell
, the trial court's error continued into the aggravation-mitigation stage because the section 9–1(b)(8) statutory aggravating factor was weighed in arriving at imposing defendant's death sentence, there is nothing in the record in the matter at bar which indicates that the jury was improperly influenced by the prosecutor's comments.

Defendant additionally challenges the prosecutor's remarks under 
People v. Adams
, 109 Ill. 2d 102 (1985). In 
Adams
, this court determined that remarks by the prosecutor at both the first and second phase of the sentencing hearing that the defendant qualified for the death penalty because he intended to, and did, kill a “witness” to a crime were so prejudicial as to entitle the defendant to a new sentencing hearing. The prosecutor in 
Adams
 told the jury in closing arguments at the eligibility phase:

“ `It was an intentional deliberate killing. 
He intended to do away with the witness
; he intended to kill him; and finally we have to show that the other felony was armed robbery.

* * *

I don't intend to belabor this phase of the hearing. I don't think that there is a lot to really argue about. The Defendant was clearly over the age of eighteen. 
He clearly committed the murder during the course of an armed robbery to get rid of the witness
.

* * *

It was intentional, and Adams himself pulled the trigger; and I would ask you to sign the verdict finding the aggravating factors stating that Adams not only committed murder and armed robbery but he committed in the fashion that the Legislature has said if you do it that way with the intent, if you are the person who did it, 
if you do it to knock off a witness, then you qualify for the death penalty
.' ” (Emphasis in original.) 
Adams
, 109 Ill. 2d at 125-26.

Further, at the aggravation-mitigation stage of the sentencing hearing, the prosecutor in 
Adams
 stated:

“We only submitted one factor to you because it was very clear that that factor applied, and that was that the murdered individual was killed in the course of another felony, he was killed by the Defendant, he was killed intentionally, and that he was committing an armed robbery. 
But there's another factor and another way that Adams qualified for falling into the category of the death penalty, and that was that the murdered individual was a witness in the prosecution or was an eyewitness or possessed other material evidence against the Defendant. [The victim], of course, was an eyewitness. So, there were actually two aggravating factors, although you only deliberated on one. Either one of which qualifies the Defendant for the death penalty.
” (Emphasis added.) 
Adams
, 109 Ill. 2d at 127-28.

This court in 
Adams
 determined that the prosecutor's comments improperly called for the jury “to weigh as an aggravating factor a circumstance that under 
Brownell
 was nonexistent.” 
Adams
, 109 Ill. 2d at 128. Based upon the entirety of the prosecutor's extended remarks, this court found reversible error because it was unclear whether the jury's deliberations and verdict were influenced by the prosecutor's improper argument. 
Adams
, 109 Ill. 2d at 128.

We determine that the challenged remarks made by the prosecutor in the cause at bar do not constitute plain error. Generally, prosecutors are permitted wide latitude in their closing arguments. 
People v. Peeples
, 155 Ill. 2d 422, 482 (1993). As a result, a reviewing court will find reversible error based upon improper prosecutorial arguments only in those instances where the remarks are “clearly prejudicial.” 
Peeples
, 155 Ill. 2d at 482. In determining whether the remarks are prejudicial, we have referred to the “content of the language used, its relation to the evidence, and its effect on the rights of the accused to a fair and impartial trial.” 
Peeples
, 155 Ill. 2d at 482-83.

Upon review of the challenged remarks made by the prosecutor in closing argument in the cause at bar, we find that the two brief statements alluding to defendant's elimination of a witness in a rape case do not approach the level of the comments found to constitute reversible error in 
Adams
. In the cause at bar, the prosecutor did not, as in 
Adams
, tell the jury that because defendant killed Maria to eliminate a witness in a rape case, this action 
independently
 qualified him for the death penalty. Moreover, the prosecutor in the instant matter neither emphasized the comments nor dwelled upon this argument. Therefore, we conclude that the two challenged sentences uttered by the prosecutor in the cause at bar are distinguishable from the prolonged and clearly prejudicial comments made by the prosecutor in 
Adams
.

In sum, we do not believe that the brief comments constituted error so fundamental or of such a great magnitude as to deprive defendant of a fair and impartial sentencing hearing. Further, we do not believe that the isolated comments had any effect on the jury's determination that the defendant was eligible for the death penalty. As noted, the eligibility determination rested on four separate grounds and indicates that the evidence was far from being closely balanced. On this record we decline to consider these comments as plain error.

Defendant's second point of error regarding prosecutorial comments during rebuttal closing arguments at the eligibility phase is that he was denied a fair hearing because the State's rebuttal argument “mischaracterized” the defense as blaming the victim and as justifying the murder due to the victim's provocation. Defendant contends that the trial court improperly overruled defense objections to these arguments, thereby violating defendant's due process rights and the cruel and unusual punishment clause.

During the State's rebuttal argument at the eligibility phase, defense counsel unsuccessfully objected to remarks made by the State. Defendant claims error in the following exchange:

“THE PROSECUTOR: Make no mistake, counsel stands up and tells you that a rage is built up and he just went off. Basically, Maria Djordjic is responsible for her own death because she said no to this man's advances. Well, ladies and gentlemen of the jury, if–

DEFENSE COUNSEL: Objection. That was not my argument.

THE COURT: The jury has heard the evidence, they have heard the arguments. They will draw their own inferences. Proceed.”

Defendant additionally claims error in the prosecutor's subsequent remarks to the jury:

“THE PROSECUTOR: *** Ladies and gentlemen of the jury, if this was heat of passion being told no, then 75 per cent of the high school age males and college males would be in prison for first degree murder. This is not provocation. That is ridiculous. Make no mistake about it–

DEFENSE COUNSEL: Judge, I never argued provocation at all.

THE COURT: Do you have an objection?

* * *

DEFENSE COUNSEL: That's beyond the scope, if that's his argument. Its a misstatement of my argument. He is responding to my argument.

THE PROSECUTOR: Judge, he talked excessively about rage –

THE COURT: I disagree.

THE PROSECUTOR: – building up. He was spurned.

THE COURT: You did. I think its invited argument. Proceed.”

Defendant asserts that the prosecutor's mischaracterization of defense counsel's arguments as stating that the victim was responsible for her own death and/or that she provoked her murder are prejudicial and inflammatory, to the extent that a jury would find it offensive for defendant to blame the victim in this case. Defendant points out that during closing arguments at eligibility, although defense counsel argued that when Maria spurned his sexual advances defendant suffered an uncontrollable rage which led to the murder, counsel never blamed the victim for declining defendant's advances. Therefore, defendant contends that the trial court erred in overruling defense counsel's objections concerning the impropriety of the prosecutor's arguments.

Defense counsel did not raise this claim for relief in defendant's post-trial motion; therefore, it is deemed waived. 
Enoch
, 122 Ill. 2d at 186. Defendant nevertheless urges us to consider this claim under the plain error rule. However, because defendant cannot meet either prong of the plain error doctrine, we decline to consider defendant's claim as plain error.

As stated, because a prosecutor has great latitude in presenting his closing argument, reversal is only appropriate where the remarks are clearly prejudicial to the defendant. 
Peeples
, 155 Ill. 2d at 482. The trial court is in the best position to determine the prejudicial effect of a remark made during closing argument, and, therefore, absent a clear abuse of discretion, its ruling should be upheld. 
Peeples
, 155 Ill. 2d at 483.

Our review of the record indicates that the trial court did not err in overruling defense counsel's objections to the challenged statements. During the sentencing hearing, defense counsel argued that defendant's murder of Maria was precipitated by an uncontrollable rage. As defendant himself points out in his brief to this court, defense counsel contended during closing arguments that once Maria spurned defendant's sexual advances, “[a] rage built up, a well of emotion, if you will, a wave. And like a wave in the ocean, he couldn't stop it *** this rage he can't control.” Therefore, the prosecutor's statements validly questioned defendant's theory of the case and did not deprive defendant of his right to a fair trial. We additionally note that any alleged error resulting from this remark would also have been cured by the trial judge's instruction to the jury that the closing arguments of counsel do not constitute evidence. 
Peeples
, 155 Ill. 2d at 482. In sum, because we find that defendant did not suffer any substantial prejudice as a result of the trial court's rulings, and that the evidence at eligibility was not closely balanced, the plain error doctrine is not applicable to defendant's claim.

The Section 9–1(b)(11) Aggravating Factor

Defendant was found eligible for the imposition of the death sentence on four aggravating factors, including section 9–1(b)(11), which provides for death sentence eligibility where the defendant was 18 years or older at the time of the offense, and where “the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom.” 720 ILCS 5/9–1(b)(11) (West 1994). Defendant contends that this aggravating factor is “unconstitutionally vague on its face.” Specifically, defendant contends that the use of “vague” language in section 9–1(b)(11), such as “cold,” “calculated,” and “premeditated,” violates the eighth amendment of the United States Constitution, as it impermissibly fails to narrow the class of those defendants eligible for death because it requires no additional mental state beyond intent, a mental state defendant asserts is “present in almost all murders.”

This court has repeatedly rejected the argument that the language employed by the legislature in section 9–1(b)(11) is unconstitutionally vague. In 
People v. Johnson
, 154 Ill. 2d 356, 372-73 (1993), this court held that the terms “cold, calculated and premeditated” as used in section 9–1(b)(11) “provide adequate guidance for assessing death eligibility.” More recently, in 
People v. Munson
, 171 Ill. 2d 158 (1996), we rejected arguments virtually identical to those made by defendant at bar. In 
Munson
, the defendant asserted that he had been deprived of a fair sentencing hearing because the terms “cold, calculated and premeditated” contained in section 9–1(b)(11) “could apply to every defendant eligible for the death penalty [and] [t]hus, this factor fails to place any inherent restraint on a capital sentencer's discretion in imposing death.” 
Munson
, 171 Ill. 2d at 191. In rejecting the defendant's argument in 
Munson
, we held that the aggravating factor contained in section 9–1(b)(11) “pertains to the intent to murder pursuant to a particular plan, scheme or design. It is not simply the intent to commit murder. As such, this factor is not present in every murder case. Thus, contrary to defendant's argument, the factor does place the necessary restraint on the sentencer's discretion to impose death.” 
Munson
, 171 Ill. 2d at 191.

Although defendant in the cause at bar acknowledges that this court has previously rejected the claim for relief he is presently requesting, he nevertheless urges this court to reconsider this issue in light of a 1994 decision rendered by the Florida Supreme Court in 
Jackson v. State
, 648 So. 2d 85 (Fla. 1994). We decline to reconsider our previous holdings that the language employed in section 9–1(b)(11) is not unconstitutionally vague. Defendant articulates no new and compelling reason for this court to deviate from our well-established precedent.

 Defendant also contends in his brief to this court that the “totality of the evidence at the sentencing hearing showed that the murder was not committed in a cold, calculated, and premeditated manner, but resulted from a rage erupting from [defendant's] personality structure and the victim's rejection of his request for consensual sex.” Defendant maintains that this was not a carefully planned murder subject to the section 9–1(b)(11) eligibility factor. Therefore, defendant argues that he is entitled to a new sentencing hearing without the section 9–1(b)(11) factor.

We determine that the jury could have found that the evidence adduced at the sentencing hearing established beyond a reasonable doubt that defendant committed the murder in a “cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means.” 720 ILCS 5/9–1(b)(11) (West 1994). The record establishes that the victim had been a longtime friend of the Grafs, and would often sleep at the Grafs' apartment a few times a month before she moved in with them during August 1993. Defendant had been living with the Grafs since the fall of 1992, and was acquainted with Maria since that time. Defendant's friend, Tom Richardson, testified that on October 31, 1992, defendant told him that defendant intended to hit Maria over the head with a crowbar, rape her, steal her car, and escape to New York City, all of which eventually transpired. In addition, Richardson testified that defendant told him that defendant planned to attack Maria after she had taken a shower in the Grafs' bathroom, which was located between defendant's room and the Grafs' bedroom, again, foreshadowing the circumstances of this crime. Richardson testified that defendant then showed him a crowbar which defendant retrieved from his dresser drawer, one end of which defendant had wrapped with electrical tape. Once again, this foreshadowed the events of the crime, to the extent that defendant used such a crowbar as the murder weapon. Richardson further testified that in April and May of 1993, defendant repeated his plan to hit Maria over the head with a crowbar, rape her, steal her car, and leave for New York City.

In addition, in the course of the confession defendant gave to Detectives Van Stedum and Simo in New York City on June 10, 1994, defendant told the police officers that the year before the murder he was “planning on doing the same thing.” When asked if the “same thing” meant hitting a girl over the head, defendant replied, “Right, or taking her purse or, you know ***.” From defendant's confession, the jury could determine that defendant had a generalized preconceived plan of attacking women by hitting them over the head with a crowbar and robbing and raping them, and, in furtherance of this scheme, purchased a crowbar, taped the end, and secreted it in his bedroom.

In addition, the record supports the conclusion that defendant's actions were “cold” and “calculated” within the meaning of section 9–1(b)(11). In his confession, defendant related that after he inflicted the first blow to Maria's head, she fell back on the bed and her head started bleeding. Defendant then jumped on top of her and repeatedly struck Maria's head with the crowbar. When he thought he had killed her, he attempted to clean the blood splatters from the wall and then cleaned himself up and did his laundry. In the interim, defendant placed a pillow over Maria's head, took off her clothes, and raped her. Upon completion of the rape, defendant drove Maria's car to an Elk Grove Village pawn shop and pawned Maria's VCR. He then returned to the apartment, gathered his things, and decided to rape Maria a second time before, in defendant's words, Maria became “cold and stiff.” Defendant thereafter took Maria's purse and departed in her car for New York City.

Therefore, the evidence supports the jury's determination that defendant murdered Maria in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take her life by unlawful means. Furthermore, defendant's repeated striking of Maria over the head with the crowbar created a reasonable expectation that she would die. Thus, the evidence was sufficient to prove the existence of the aggravating factor set forth in section 9–1(b)(11).

In his brief to this court, defendant asserts that the “totality of the evidence” at the sentencing hearing reveals that this murder was not cold, calculated and premeditated within the meaning of the section 9–1(b)(11) aggravating factor. In support of this assertion, defendant argues that the testimony given by Dr. Wahlstrom during the aggravation-mitigation phase “disproved” the section 9–1(b)(11) statutory factor in aggravation. Even if Dr. Wahlstrom's testimony had been presented as part of the evidence during the initial, eligibility phase, we are not persuaded that it would alter the conclusion that the jury found defendant eligible for the death sentence on the section 9–1(b)(11) aggravating factor beyond a reasonable doubt.

As a final argument, defendant urges this court to adopt a standard of “heightened premeditation” for the aggravating factor of cold, calculated and premeditated murder. Defendant cites to decisions rendered by the Supreme Court of Florida where that court adopted the phrase “heightened premeditation” to distinguish the cold, calculated and premeditated aggravating factor from the premeditation element of first degree murder. See, 
e.g.
, 
Jackson v. State
, 648 So. 2d 85, 89 (Fla. 1994); 
Porter v. State
, 564 So. 2d 1060, 1064 (Fla. 1990). Under Florida's standard, although “heightened premeditation” may be demonstrated by the manner of the killing, the evidence “must prove beyond a reasonable doubt that the defendant planned or arranged to commit murder before the crime began.” 
Porter
, 564 So. 2d at 1064. As stated, this court has repeatedly upheld section 9–1(b)(11) against constitutional challenges and has found that this aggravating factor does not apply to every murder, but only to those perpetrated pursuant to a particular plan, design or scheme. 
Munson
, 171 Ill. 2d at 191. Defendant offers no persuasive reason why we should depart from our previous holdings.

Challenges to Eligibility Based Upon the Felony-Murder Aggravation Evidence

Defendant argues that the jury's verdicts on eligibility based upon felony murder were legally insufficient because they omitted the mental elements of the underlying felonies. The section 9–1(b)(6) aggravating factor provides for eligibility in murder cases where the defendant was 18 years or older at the time of the offense (720 ILCS 5/9–1(b) (West 1994)), and where the victim was killed in the course of another felony (720 ILCS 5/9–1(b)(6) (West 1994)); was killed by the defendant or was physically injured by the defendant substantially contemporaneously with the injuries that caused death (720 ILCS 5/9–1(b)(6)(a) (West 1994)); the defendant acted with the intent to kill the murdered individual or the knowledge that his acts created a strong probability of death or great bodily harm (720 ILCS 5/9–1(b)(6)(b) (West 1994); and the other felony was one of those enumerated in the statute (720 ILCS 5/9–1(b)(6)(c) (West 1994)).

Relying upon this court's decision in 
People v. Mack
, 167 Ill. 2d 525 (1995), defendant contends that the verdict forms finding defendant eligible for the death penalty on the three felony-murder aggravating factors are legally insufficient because they omitted the requisite mental state language that “defendant acted with the intent to kill the murdered individual or with the knowledge that his acts created a strong probability of death or great bodily harm.” 720 ILCS 5/9–1(b)(6)(b) (West 1994). Defendant is correct that the verdict forms on the felony murder eligibility factors were legally insufficient in that they failed to include defendant's 
mens rea
. 
People v. Jackson
, 182 Ill. 2d at 68, citing 
People v. Mack
, 167 Ill. 2d 525, 538 (1995).

Notwithstanding, the State argues that defendant has waived this claim of error, as defendant neither objected to these points at trial nor raised this claim in his post-trial motions. 
Enoch
, 122 Ill. 2d at 186. Defendant argues that the deficiency falls within the purview of the plain error rule, which permits a reviewing court to take notice of plain errors and defects affecting substantial rights in instances where the evidence is closely balanced or where the error affected the fundamental fairness of the proceeding. 
People v. Fields
, 135 Ill. 2d 18, 56 (1990).

We need not decide this question, because we have determined that defendant was properly found eligible for the death sentence under section 9–1(b)(11), specifically, that defendant committed the murder in a cold, calculated and premeditated manner. This court has repeatedly recognized that under the Illinois death penalty statute, special emphasis is not accorded to any aggravating factor and no added significance is given to multiple aggravating factors as opposed to a single factor. 
People v. Brown
, 169 Ill. 2d 132, 164 (1996). Therefore, in those instances where a defendant is eligible based upon two or more statutory aggravating factors, the fact that one of those factors may later be invalidated may not impair the eligibility finding as long as a separate, valid aggravating factor supported eligibility. 
Brown
, 169 Ill. 2d at 165 (citing 
People v. Page
, 156 Ill. 2d 258, 268 (1993), and 
Zant v. Stephens
, 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50 (1983)).

Defendant also argues that he was denied a fair capital sentencing hearing because he was unduly prejudiced when the trial judge allowed the jury to hear that defendant had already been convicted of six counts of murder by the judge at the guilt phase of his trial. Defendant argues that pursuant to section 9–1(b), the only information an eligibility jury needs to know about findings at trial is that the defendant has been “found guilty of first degree murder.” 720 ILCS 5/9–1(b) (West 1994). Defendant therefore contends that the six murder counts should have been merged into one murder conviction, and only that conviction should have been introduced to the jury. Defendant maintains that the events here created a presumption of eligibility in spite of the fact that a defendant is presumed ineligible until proven eligible beyond a reasonable doubt. According to defendant, the introduction of findings of guilt of all the multiple forms of murder as evidence at the eligibility phase constitutes reversible error as it overwhelmed the jury and tainted the entire eligibility hearing, including the jury's determination as to the section 9–1(b)(11) aggravating factor.

We need not address defendant's assertions concerning this issue because we have already determined that defendant was properly found eligible for the death penalty under the cold, calculated and premeditated aggravating factor. Even if we were to invalidate a finding of eligibility based upon the three felony-

murder aggravating factors, defendant would still be eligible on the basis of the jury's verdict on the cold, calculated and premeditated aggravating factor. See, 
e.g.
, 
People v. Brown
, 169 Ill. 2d 132, 165 (1996) (citing 
People v. Page
, 156 Ill. 2d 258, 268 (1993), and 
Zant v. Stephens
, 462 U.S. 862, 880-90, 77 L. Ed. 2d 235, 252-58, 103 S. Ct. 2733, 2744-50 (1983)). We additionally reject defendant's assertion that the alleged error rendered the entire eligibility hearing unfair. The record discloses no support for the defendant's assertion that the jury was overwhelmed by the introduction of the court's findings of guilt.

II. Aggravation-Mitigation Stage

Prosecutorial Comments During Closing Arguments

Defendant argues that the trial court committed reversible error by sustaining the State's objection to defense counsel's closing argument at the aggravation-mitigation stage that defendant suffered from a severe mental illness, thereby giving the jury the impression that the court agreed with the State's position that no extreme mental or emotional disturbance mitigator had been established, when there was evidence presented of defendant's history of emotional deprivation and personality disorders. Defendant challenges the following exchange:

“DEFENSE COUNSEL: Look at his home environment. Because of that home environment, Geno Macri is diagnosably ill; severe mental disturbance.

THE PROSECUTOR: Object to that.

THE COURT: What's the basis?

THE PROSECUTOR: To counsel's characterization of severe mental illness.

THE COURT: It will be sustained.”

Defense counsel immediately thereafter continued his closing argument as follows:

“DEFENSE COUNSEL: He's diagnosed with several mental illnesses. One of which, I believe if the testimony was correct, is considered one of the most severe there is, and that's borderline personality disorder. And that renders him incapable of dealing with stress that maybe the rest of us could handle.”

Defendant contends that the court erred in sustaining the State's objection because there was substantial evidence that defendant had been emotionally deprived as a result his home environment and that defendant suffered from severe mental and/or emotional disturbances, specifically three different personality disorders. Defendant therefore maintains that the court's ruling favored the State because it supported the State's argument that there was insufficient evidence of an extreme mental and emotional disturbance to defeat a death sentence. Defendant also complains that during the State's rebuttal argument, the court overruled the defense objection to the State's argument that defendant showed “cowardice” in “trying to blame his mother for his actions in murdering another woman.” Defendant contends that his rights under the eighth and fourteenth amendments were violated because both of the court's rulings unduly burdened the defense in establishing his mitigation case under the extreme mental or emotional disturbance mitigator of section 9–1(c)(2) (720 ILCS 5/9–1(c)(2) (West 1994)).

Regarding the trial court's sustaining of the prosecutor's objection to defense counsel's use of the phrase “severe mental disturbances,” although defendant objected at trial to the complained-of remark, the record indicates that defendant did not raise this claim of error in his post-trial motions. Therefore, this specific claim is waived. 
Enoch
, 122 Ill. 2d at 186. However, in capital cases, this court has also recognized that the procedural bar will be excused if a timely trial objection has been made and the claims can be raised later in a post-conviction hearing petition. 
People v. Keene
, 169 Ill. 2d 1, 10 (1995); 
Enoch
, 122 Ill. 2d at 190. Because defendant has framed his argument as a deprivation of due process based upon the fourteenth amendment, as well as an eighth amendment violation against cruel and unusual punishment, both of which may be entertained under the Post-

Conviction Hearing Act (see 725 ILCS 5/122–1 (West 1994)), we address the merits of defendant's claim.

The sustaining of an objection to defense counsel's statement is not an indication of the court's opinion as to the facts or the verdict. We reject defendant's assertion that the ruling improperly indicated to the jury that defendant had not established the existence of severe mental and emotional disturbances. To the contrary, the jury was presented with Dr. Wahlstrom's testimony that defendant was under an extreme mental or emotional disturbance at the time he killed Maria, and that he suffered from three disorders: antisocial personality disorder, borderline personality disorder, and avoidant personality disorder. Further, the record shows that when defense counsel proceeded with his argument and mirrored the expert's testimony concerning borderline personality disorder, no objections were made by the State. Finally, the jury was instructed that the court's remarks and rulings did not indicate the court's opinion regarding any facts or the verdict. We therefore conclude that defendant's claim lacks merit.

Concerning defendant's challenge to the “cowardice” comment, which was properly preserved for review, it is well established that prosecutors are afforded wide latitude in closing argument, and a prosecutor's comments in closing argument will result in reversible error only when they engender “substantial prejudice” against the defendant to the extent that it is impossible to determine whether the verdict of the jury was caused by the comments or the evidence. 
People v. Henderson
, 142 Ill. 2d 258, 323 (1990). Closing arguments must be reviewed in their entirety, and the challenged remarks must be viewed in context. 
People v. Kitchen
, 159 Ill. 2d 1, 38 (1994). Examining the challenged remarks in context, we determine that the comments of the prosecutor in the cause at bar do not constitute reversible error. Rather, the remarks were designed to rebut the defense claim that defendant's actions resulted from a mother who had emotionally abandoned him, which allegedly caused defendant to have violent sexual fantasies leading to murder. However, defendant presented no evidence that defendant's mother had ever perpetrated any sexual or physical abuse against defendant. Further, the evidence showed that shortly before the murder, defendant's mother on two occasions provided defendant with rent money when his rent was in arrears. During the sentencing hearing, the prosecutor may contest the significance and weight of the defendant's mitigating evidence, and is not required to agree that the evidence offered in mitigation by defendant is indeed mitigating. 
People v. Hudson
, 157 Ill. 2d 401, 454-55 (1993). Here, the prosecutor's statement did not restrict or limit the defendant's presentation of mitigating evidence, nor did it misstate to jurors the applicable law governing their consideration of the evidence. 
Hudson
, 157 Ill. 2d at 455. Finally, the record reveals that the jury had also been instructed that the attorney's closing arguments were not evidence. In sum, the prosecutor's comment did not deny the defendant a fair trial and the trial court did not abuse its discretion in overruling defendant's objection.

Defendant's second point of error in connection with remarks made by the prosecutor at the aggravation-mitigation stage of the hearing is that his rights to due process and to be free from cruel and unusual punishment were violated by the prosecutor's closing argument that mitigation evidence concerning defendant's allegation that he suffered from an antisocial personality disorder should be taken as aggravation. Defendant admits that this claim was not preserved, but urges us to consider it under the plain error doctrine.

During its initial closing argument at the aggravation-

mitigation phase, the State addressed the testimony given by Dr. Wahlstrom that defendant suffered from an antisocial personality disorder which frequently abates when individuals reach their forties. Defendant challenges comments made by the prosecutor in response to the assertion that defendant had an antisocial personality disorder:

“You heard the evidence that the defendant had an antisocial personality. And Dr. Wahlstrom told you that antisocial personality is a persistent pattern of conduct of breaking society norms, of breaking the law. And he's absolutely right when he says the defendant had an antisocial personality.

He told you some of the things that go with an antisocial personality: They are liars. They don't have any remorse. They continuously break laws. And they are more likely to keep on breaking laws. He told you that most of the people that he sees in Stateville have antisocial personalities.

If you think about it for a second, it makes perfect sense. They wouldn't be in jail if they followed society's rules. They wouldn't be in jail if they didn't break laws. Of course, an antisocial personality person is going to be in jail. By its very definition, they don't follow the laws.

That's not mitigation. That's aggravation. The defendant has an antisocial personality, and that is aggravating, because the defendant is more likely to go out and commit more crimes. The defendant is not remorseful.

Dr. Wahlstrom says, `Well, this antisocial personality persists in a lot of people.' And for $6,000, he came in here and told you the antisocial personality is basically someone who is a career criminal. Its somebody who continuously commits crimes. That is what a career criminal is. They continuously commit crimes. And that's what an antisocial person is, and that's the defendant.”

A similar argument was repeated by the State in rebuttal closing argument:

“But the antisocial personality disorder is not schizophrenia where he has voices in his head telling him to kill. It means he's a criminal. He doesn't like to conform his conduct to the norms of the law. He likes to violate other people's rights.

Its not mitigation. Is that mitigation in any way sufficient to preclude the imposition of death, that he suffers from an antisocial personality disorder? Absolutely not.”

Defense counsel made no objection to these remarks. Defendant now contends that the prosecutor committed plain error in stating that defendant's mitigating evidence was actually aggravating evidence. According to defendant, the remarks made by the State improperly restricted the jury's consideration of the mitigating evidence introduced by defense counsel at the sentencing hearing, as the comments could have led the jury to believe that defendant's antisocial personality disorder constituted an aggravating circumstance which in and of itself was a reason to sentence defendant to death.

Defense counsel neither raised an objection to the prosecutor's remarks at trial nor included this claim of error in defendant's post-

trial motion. Accordingly, defendant's claim for relief has been waived. 
Enoch
, 122 Ill. 2d at 186. Although defendant urges us to consider this claim of error under the plain error rule, because the evidence is not closely balanced and the alleged error is not so fundamental and of such magnitude as to deny defendant a fair trial, defendant has met neither requirement of the plain error doctrine. See 
Miller
, 173 Ill. 2d at 191-92.

 We have repeatedly held that a prosecutor's remarks constitute reversible error only when they engender “substantial prejudice” against the defendant. 
E.g.
, 
Henderson
, 142 Ill. 2d at 323; 
Peeples
, 155 Ill. 2d at 482. We find that the remarks of the prosecutor fall within the parameters of proper closing argument. After carefully reviewing the record, we conclude that the remarks of the prosecutor summarized Dr. Wahlstrom's findings. Dr. Wahlstrom testified that individuals with antisocial personality disorder are prone to deceit and manipulation, to the extent that they “may repeatedly lie, use an alias, con others, or malinger,” that they fail to conform to social norms with respect to lawful behavior, constituting “[a] disregard for and violation of the rights of others,” and that they continue committing this pattern of repetitive behavior “up to a certain point and then they tend to slow down, especially with relation to criminal behavior, and that's in the fourth decade of life, or in the 40s.” Further, Dr. Wahlstrom could not state that defendant would cease to commit crimes. Thus, much of the prosecutor's argument reflected the testimony given by defendant's expert regarding the antisocial personality disorder.

Further, we have rejected precisely the same argument made by defendant in the instant matter in
 People v. McNeal
, 175 Ill. 2d 335 (1997). There, the defendant argued, as defendant does in the matter at bar, that the prosecutor violated the eighth amendment by remarking during closing arguments that the defendant's antisocial personality disorder constituted aggravating, rather than mitigating, evidence. In 
McNeal
, the prosecutor argued as follows:

“And what is antisocial personality disorder? Its just being mean and violent is what it comes down to, and he told you that.

Basically, what it comes down to is the person we have here, the doctors can put it into fancy words, the fancy words being antisocial personality disorder or whatever else they want to pick out of their book, but the bottom line is the character of this man, his meanness, his violence, his sadism. That's not a mitigating factor. That's an aggravating factor. It's not a mitigating factor that he has an antisocial personality disorder. Its an aggravating factor. It shows you how violent he can be. And the doctor himself told you that he can even be violent in prison.” 
McNeal
, 175 Ill. 2d at 368.

In rejecting the defendant's assertions in 
McNeal
, we determined that “defendant's antisocial personality disorder is *** a double-

edged sword for purposes of mitigation and aggravation *** [as] not every mental or emotional condition that can be classified as a `disorder' will necessarily be mitigating.” 
McNeal
, 175 Ill. 2d at 370. In 
McNeal
, we concluded that “the prosecutor merely disagreed with the defendant's characterization of that evidence as mitigation, as he is permitted to do.” 
McNeal
, 175 Ill. 2d at 371. As in 
McNeal
, the prosecutor in the cause at bar at no time suggested to the jurors that the law did not allow them to consider the evidence presented in mitigation and defendant makes no assertion that the jury was not properly instructed by the trial court concerning its consideration of mitigation evidence. We adhere to our decision in 
McNeal
 and find that the prosecutor's characterization of defendant's antisocial personality disorder as a factor in aggravation did not deprive defendant of a fair and reliable sentencing hearing. Accordingly, no plain error occurred.

Jury Instructions

Defendant raises errors concerning the instructions given to the jury at the conclusion of the aggravation-mitigation stage of the sentencing hearing. Defendant contends that he was denied a fair sentencing hearing because of the instruction given to the jury concerning defendant's violent sexual fantasies against women other than the victim in this case. At the eligibility phase of the proceedings, the trial court granted defendant's motion 
in limine
 to exclude all evidence of defendant's sexual fantasies, which included acts of violence against women. The court allowed testimony concerning defendant's purchase of the crowbar. However, the trial court denied defendant's same motion 
in limine
 at the aggravation-mitigation stage of the proceedings, ruling that the evidence would be admissible and that the court would also give the jury a cautionary instruction pursuant to this court's decision in 
People v. Devin
, 93 Ill. 2d 326 (1983). Both sides eventually agreed on the following instruction:

“You have before you evidence that the defendant made statements regarding his desire to commit acts of violence against individuals, other than Maria Djordjic. The corroboration that the defendant did act or did not act upon these statements has been presented.”

Because all parties ultimately agreed to this instruction, defendant now brings this claim for relief under the plain error rule (134 Ill. 2d R. 615(a)).

Defendant has not met either of the requirements to invoke the plain error doctrine, for, as stated, the evidence introduced at the sentencing hearing was not closely balanced, and, further, the alleged error did not deprive defendant of a fair and impartial trial. See 
Fields
, 135 Ill. 2d at 69-70. Defendant contends that the instruction given by the trial court not only failed to comply with 
Devin
, but also violated his rights to due process to the extent that it misled the jury that all of defendant's sexual fantasies discussed during the proceedings were corroborated. Thus, defendant maintains that the jury could have applied the instruction to conclude that the uncorroborated fantasies were accurate descriptions of conduct in which defendant had actually engaged.

We find defendant's reliance upon this court's decision in 
Devin
 unavailing. In 
Devin
, the defendant had been diagnosed as a sociopath by psychiatrists retained by both the defendant and the State. These psychiatrists agreed that a sociopathic personality frequently engages in fantasies and that much of the conduct of a sociopathic personality results from efforts to carry out those fantasies. Numerous witnesses testified that the defendant had told them that he had tortured and killed several people. The jury heard this testimony concerning the witness' conversations with the defendant without being given a cautionary instruction that there was no corroborating evidence which tended to prove that any of the conduct described had actually occurred. In light of the fact that “[t]he jury was given no guidance that would assist them in the determination of whether the conversations to which the witnesses testified purported to recount actual occurrences or whether they were pure fantasy,” this court determined that a jury could “reach a conclusion as to defendant's `character and propensities,' not on the basis of his conduct, but on the basis of his sociopathic fantasies.” 
Devin
, 93 Ill. 2d at 349.

In contrast to the “extraordinary circumstances” (
Devin
, 93 Ill. 2d at 349) with which this court was presented in 
Devin
, the same level of potential for confusion between defendant's fantasies and reality is not present in the instant cause. The witnesses who testified during the aggravation stage concerning defendant's fantasies all spoke in terms of defendant's thoughts and desires. The record clearly indicates that these witnesses were describing conversations in which defendant discussed his desires or fantasies. The record in the instant matter is replete with testimony that defendant “would like to,” “wanted to,” and “planned on” doing certain violent acts towards women, but no witness' testimony at aggravation indicated that defendant had professed to actually carrying out his desires. These conversations are distinguishable from the conversations in 
Devin
, where the defendant professed to be relating prior actual conduct. Therefore, defendant's reliance upon 
Devin
 is inapposite, and no plain error occurred.

We additionally find that the instruction given by the trial court was adequate to protect defendant's right to a fair sentencing hearing. The challenged instruction stated that it was within the discretion of the jury to consider what extent the testimony regarding defendant's violent sexual fantasies were corroborated. The instruction also informed the jury that corroborating evidence was not offered regarding some of the testimony of defendant's violent fantasies. As such, the instruction provided the jury with the appropriate level of guidance in light of the plain language of the witness' testimony indicating that defendant was not relating actual prior conduct. Additionally, defense counsel in summation argued that defendant's fantasies were the product of his alleged mental condition and that he merely talked about his desires and wishes, and did not act upon them.

Defendant's second point of error in connection with the instructions given to the jury at the aggravation-mitigation stage of the hearing is that the trial court committed reversible error by rejecting the following jury instruction submitted by the defense:

“If one or more of you believe that the death penalty should not be imposed then sign the appropriate verdict form.”

The trial court refused to give this instruction because it was a non-pattern instruction. Instead, the trial judge gave IPI Criminal 3d No. 7C.05, which provides:

“Under the law, the defendant shall be sentenced to death if you unanimously find that there are no mitigating factors sufficient to preclude imposition of a death sentence.

If you are unable to find unanimously that there are no mitigating factors sufficient to preclude imposition of a death sentence, the court will impose a sentence other than death.”

 Defendant contends that his due process and eighth amendment rights were violated by the trial court's refusal to give his tendered instruction on the unanimity rule because absent such instruction there was a great likelihood that the jury misunderstood that it had to be unanimous in the event it voted for a sentence other than death.

We disagree. We have previously held that “it is for the trial court to determine, after considering the facts and the governing law, whether the jury should be instructed on a particular subject.” 
People v. Gilliam
, 172 Ill. 2d 484, 519 (1996). However, “[i]f an appropriate IPI instruction exists, it must be used.” 
Gilliam
, 172 Ill. 2d at 519. In the cause at bar, the trial court rejected defendant's tendered instruction and instead gave the jury IPI Criminal 3d No. 7C.05, which clearly and completely informed the jury of the unanimity rule. “An abuse of discretion in the refusal of a non-IPI instruction occurs only when there is no IPI instruction that applies to the subject on which the jury would have been instructed.” 
Gilliam
, 172 Ill. 2d at 519. Thus, the trial court did not abuse its discretion in refusing defendant's non-pattern jury instruction concerning the unanimity rule where there was an applicable pattern instruction regarding the same subject matter.

Further, this court has repeatedly rejected a related argument that jury instructions mirroring IPI Criminal 3d No. 7C.05 impermissibly misled jurors into believing that unanimity was required before a mitigating factor could be considered. This court determined that the language of the instructions sufficiently informed the jury that it did not need to unanimously agree upon a specific mitigating factor in order to consider such a factor. 
People v. Miller
, 173 Ill. 2d 167, 196-98 (1996); 
People v. Brown
, 172 Ill. 2d 1, 58-59 (1996). Therefore, as the challenged instructions are clear enough to inform the jury that it need not be unanimous on a specific mitigating factor in order to consider that factor in its deliberations, the instructions are likewise clear enough to inform the jury that any decision declining to impose a death sentence need not be unanimous, a concept which is far more apparent in the plain language of the instructions. Accordingly, we conclude that the jury was appropriately and sufficiently instructed that unanimity was not required to relieve defendant from the death sentence. The trial court did not abuse its discretion in refusing to give defendant's tendered instruction.

Defendant's third and final point of error concerning the jury instructions at the aggravation-mitigation phase of his sentencing hearing is that the jury was improperly instructed upon the felony-

murder aggravating factors. Defendant contends that the instruction improperly omitted the mental elements of the underlying felonies:

“In deciding whether the defendant should be sentenced to death, you should consider all the aggravating factors supported by the evidence, and all the mitigating factors supported by the evidence.

* * *

Aggravating factors include:

First, the defendant committed murder during the course of an aggravated criminal sexual assault, armed robbery, and robbery, and the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created an unreasonable expectation that the death of a human being would result therefrom.”

Defendant contends that in weighing and considering the felony-

murder aggravating factors at the final phase of the sentencing hearing, the jury was misguided concerning these factors in aggravation and this influenced the determination for death. Although there was no objection raised at trial and the claim of error was not preserved in defendant's post-trial motions, defendant contends that waiver does not apply because this alleged error falls within the purview of the plain error doctrine. However, defendant fails to satisfy either prong of the plain error doctrine.

As stated, the evidence in this proceeding was not closely balanced. Further, we determine that the error alleged by defendant was not so fundamental and of such magnitude as to deny defendant a fair trial. See 
Miller
, 173 Ill. 2d at 191-92. After having found defendant eligible for the death penalty, the jury was free to consider, during the second phase of the sentencing hearing, the circumstances of the defendant's offense. 
People v. Todd
, 154 Ill. 2d 57, 76 (1992). This court has repeatedly held that during the second phase of the hearing, the jury is free to consider any relevant and reliable evidence in aggravation and mitigation. 
Todd
, 154 Ill. 2d at 76; 
People v. Terrell
, 132 Ill. 2d 178, 225 (1989). Thus, even if the jury were “misguided,” as defendant urges, concerning the three felony-murder aggravating factors, defendant raises no claim that inadmissible evidence was before the jury during its sentencing deliberations or that defendant had been precluded from adducing relevant mitigating evidence. See 
Zant v. Stephens
, 462 U.S. 862, 887, 77 L. Ed. 2d 235, 256, 103 S. Ct. 2733, 2748 (1983). The record discloses no support for defendant's claim that the jury's deliberations were improperly influenced by the instructions given to the jury.

Defendant's Attempted Waiver of All Sentences Other Than Natural Life in Prison

Defendant contends that his rights to due process and to be free from cruel and unusual punishment were violated when the trial court refused to allow defendant to waive lesser prison sentences and face only the alternative of natural life in prison if the jury should determine that he was not eligible for death. Defense counsel offered the trial court a written waiver, signed by defendant, to any sentence less than natural life in prison, and argued that upon acceptance of such a waiver the jury could be instructed, under this court's ruling in 
People v. Gacho
, 122 Ill. 2d 221 (1988), that the only alternative to a sentence of death would be a sentence of natural life in prison without parole. In defendant's brief to this court, defendant states that he “perceived the 
Gacho
 natural life instruction as a positive advantage in his effort to defeat the death penalty. To make that instruction valid, he would have to waive all lesser sentences. This he was willing to do.” In rejecting defendant's proffered waiver, the trial court judge ruled that “[defendant] can't waive himself into a specific sentence.” Defendant asserts that the trial court's ruling constitutes reversible error.

We are not persuaded by defendant's arguments. In 
People v. Simms
, 168 Ill. 2d 176, 198 (1995), the defendant argued, as does defendant in the matter at bar, that the trial court erred when it refused to instruct the jury that the defendant would be sentenced to natural life in prison if he did not receive a sentence of death. In 
Simms
 we rejected the defendant's argument and held that a natural life jury instruction is available only under the circumstances stated in 
Gacho
, specifically, where the sentencing options for a particular defendant are limited to either natural life or the death penalty. 
Simms
, 168 Ill. 2d at 199. Such an instruction is unavailable where, as here, the defendant is statutorily eligible for a sentence less than natural life in prison. 
Simms
, 168 Ill. 2d at 199.

Our ruling in the instant cause additionally comports with the general principle that sentencing is a matter within the sound discretion of the court. See 
People v. Wilson
, 143 Ill. 2d 236, 250 (1991). In the cause at bar, if the jury had determined that death was not an appropriate sentence for defendant, the trial court would have possessed sole discretion in sentencing defendant to a term of imprisonment for the murder. Allowing defendant to execute a waiver would usurp the court's sentencing function, and defendant offers no rationale why he should be afforded the authority to remove the sentencing decision from the trial court. Further, we do not condone a defendant's attempt to choose a sentence that suits him, and, by so doing, manipulate the sentencing process in order to obtain a 
Gacho
 instruction. Finally, acceptance of such a waiver could engender additional litigation challenging the waiver's validity. Accordingly, the trial court did not violate defendant's constitutional rights nor did it abuse its discretion in refusing to accept defendant's tendered waiver of sentence.

Defendant also contends that a jury's sentencing decision is denied the requisite level of constitutional reliability under the eighth amendment if the jury is unaware of other viable sentencing options. We have previously rejected this argument. 
People v. Simms
, 143 Ill. 2d 154, 181-82 (1991) (“it is not error to refuse to instruct the jury of the possible terms of imprisonment which the defendant might receive if not sentenced to death”).

In a related argument, defendant contends that his rights to due process, equal protection, and to be free from cruel and unusual punishment were violated when the trial court denied his request to inform the sentencing jury that one of the sentences available was life imprisonment without possibility of parole. Defendant contends that he was constitutionally entitled to this instruction because the State argued that defendant's future dangerousness was a reason to impose a sentence of death. In support of this argument, defendant relies upon the 1994 United States Supreme Court decision in 
Simmons v. South Carolina
, 512 U.S. 154, 129 L. Ed. 2d 133, 114 S. Ct. 2187 (1994), and argues that without such sentencing information, the jury could have considered him too dangerous for any sentence other than death, especially if the jury believed that defendant might, as an alternative to death, receive a parole-eligible prison sentence.

At the outset, we note that defendant never argued his equal protection claim below. It is well established that “[o]bjections at trial on specific grounds waive all other grounds of objection.” 
People v. Miller
, 173 Ill. 2d 167, 191 (1996). Therefore, defendant's equal protection challenge to the trial court's ruling has been waived.

Defendant argues that the United States Supreme Court decision in 
Simmons
 compelled the trial court to instruct the jury on the alternative sentences the defendant could serve if he was not sentenced to death. As we held in 
People v. Simpson
, 172 Ill. 2d 117, 152 (1996), the 
Simmons
 holding “addresses those situations where state law mandates that if the defendant is not sentenced to death, the only alternate sentence is natural life imprisonment.” Accordingly, the trial court did not err in its ruling.

Challenge to Imposition of the Death Sentence Based Upon The “Totality of the Evidence” Regarding the Section 9–1(b)(11) Aggravating Factor

Defendant next contends that the “totality of the evidence” at the sentencing hearing establishes that the murder was not “cold, calculated, and premeditated” within the meaning of section 9–1(b)(11), but rather that it resulted from a rage caused by defendant's personality structure and the victim's rejection of his request for consensual sex. Relying upon the testimony of Dr. Wahlstrom during the aggravation-mitigation phase of the sentencing hearing, defendant contends that he “disproved” the section 9–1(b)(11) factor in aggravation and therefore the jury improperly determined that there were no mitigating factors sufficient to preclude the imposition of the death sentence in regards to that aggravating factor.

In determining whether a death sentence was properly imposed, this court assesses “the character and record of the individual offender and the circumstances of the particular offense.” 
Woodson v. North Carolina
, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976) (plurality opinion); 
People v. Johnson
, 128 Ill. 2d 253, 277-78 (1989). We are also mindful that “each capital case is unique and must be evaluated on its own facts, focusing on whether the circumstances of the crime and the character of the defendant are such that the deterrent and retributive functions of the ultimate sanction will be served by imposing the death penalty.” 
Johnson
, 128 Ill. 2d at 280.

As we have extensively discussed in connection with our treatment of defendant's challenge to the jury's eligibility finding pursuant to section 9–1(b)(11), the evidence adduced at the sentencing hearing established beyond a reasonable doubt that defendant committed the murder in a “cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means.” 720 ILCS 5/9–1(b)(11) (West 1994). In addition, during the second phase of the sentencing hearing, the State presented 21 witnesses in aggravation, detailing defendant's extensive criminal record beginning in his early teenage years, as well as his conduct after his arrest for Maria's murder, including statements which continued to evidence his violent thoughts towards women and his lack of remorse. In contrast, defendant presented five witnesses in mitigation, two of whom were his parents, with the majority of the evidence presented by Dr. Wahlstrom.

Under our statutory scheme, at the second stage of the sentencing proceedings the jury weighs and balances any mitigating factors against the aggravating factors to determine whether a death sentence is appropriate. 
E.g
., 
Munson
, 171 Ill. 2d at 185. If the jury unanimously determines that there are no mitigating factors sufficient to preclude the imposition of the death penalty, the court shall sentence the defendant to death. 720 ILCS 5/9–1(g) (West 1994). Upon careful consideration of the character of defendant and the circumstances of his crime, we conclude that the evidence presented during defendant's sentencing hearing supports the jury's decision that the penalty of death was appropriate.

Constitutional Challenges to the Death Penalty Statute

Defendant's constitutional challenge to the death penalty statute is confined to section 9–1(g) which provides that a defendant shall be sentenced to death if the capital sentencing jury determines that there are “no mitigating factors sufficient to preclude the imposition of the death sentence.” 720 ILCS 5/9–1(g) (West 1994). Defendant contends that the Illinois statute violates both the eighth and fourteenth amendments of the United States Constitution because an impermissibly high burden of proof is placed upon defendants to show that mitigating evidence outweighs aggravating evidence and because it precludes a jury from effectively considering mitigating evidence. Defendant also maintains that because the jury instructions given in his case tracked the language of the statute, they are likewise unconstitutional because the “language does not suggest that the sentencer should come to a subjective, discretionary, unfettered decision whether death should be imposed in a particular case but rather suggests that death should be imposed unless a particular standard of acquittal of death is met.”

Defendant first argues that section 9–1(g) violates both the eighth and fourteenth amendment of the United States Constitution because the statutory phrase “sufficient to preclude” unfairly places a burden on the defense to establish that death is not a possible sentence. Defendant contends that this language impermissibly requires a capital defendant to negate eligibility for death. In 
People v. Strickland
, 154 Ill. 2d 489, 538 (1992), this court rejected an argument substantially identical to that presented by defendant at bar. We reiterate our conclusion in 
Strickland
 that “[t]he defendant's theory rests on a strained interpretation of the statutory language *** the sentencing authority is asked only to determine whether death is the appropriate sanction in the particular case. [Citations.] The statutory language does not require the sentencer to find that the death penalty should be deemed `impossible.' ” 
Strickland
, 154 Ill. 2d at 539; see also 
People v. Cole
, 172 Ill. 2d 85, 114 (1996). We adhere to our previous rejection of defendant's contention, and decline to address this issue anew.

Defendant additionally attacks section 9–1(g) on the basis that the text of the statute precludes full, meaningful, and effective consideration of the mitigating factors. We recently reiterated our rejection of the argument that the Illinois capital sentencing statute places a burden of proof on defendants that precludes a meaningful consideration of mitigating evidence. 
People v. Taylor
, 166 Ill. 2d 414, 439 (1995); see also 
People v. Edgeston
, 157 Ill. 2d 201, 247 (1993); 
People v. Ramey
, 152 Ill. 2d 41, 76-77 (1992); 
People v. Hampton
, 149 Ill. 2d 71, 116-17 (1992); 
People v. Simms
, 143 Ill. 2d 154, 183-84 (1991); 
People v. Fields
, 135 Ill. 2d 18, 76 (1990). Defendant presents no new and compelling argument for us to depart from our previous decisions.

As a final matter, defendant attacks the constitutionality of one of the Illinois Pattern Jury Instructions which was given to the jury. Defendant argues that because IPI Criminal 3d No. 7C.05 mirrors the “sufficient to preclude” statutory language of section 9–1(g), this instruction likewise sets an impermissibly high standard for imposition of a sentence other than death. In light of our holding reaffirming the constitutionality of section 9–1(g), jury instructions which track section 9–1(g)'s language withstand a similar constitutional challenge.

In a related argument, defendant contends that even if this court finds no constitutional infirmity in the language used in section 9–1(g), the instructions given to the sentencing jury violated his eighth amendment rights because the instructions: failed to provide adequate guidance to the jurors concerning their task in weighing the aggravating and mitigating evidence; misled the jurors in that the instructions do not suggest that the jury has unfettered discretion in making the death sentence determination; and incorrectly conveyed the standard under which the jury determines that the death penalty is inappropriate, because, according to defendant, the instruction “overstat[es] the mitigation required” by use of the phrase “sufficient to preclude.” In sum, defendant reiterates his argument concerning section 9–1(g) of the statute, and likewise contends that the jury instructions precluded the jury from giving full, meaningful and effective consideration to valid mitigation evidence.

We reject defendant's argument. IPI Criminal 3d No. 7C.05 tracks the language of section 9–1(g), which, as stated, contains no constitutional infirmity. In addition, in 
People v. Gilliam
, 172 Ill. 2d 484, 520 (1996), this court determined that IPI Criminal 3d No. 7C.05 accurately reflects the statutory provisions of section 9–1(g). Further, under Rule 451(a) (134 Ill. 2d R. 451(a)), “[w]henever Illinois Pattern Instructions, Criminal ***, contains an instruction applicable in a criminal case *** and the court determines that the jury should be instructed on the subject, the IPI Criminal [3d] instruction shall be used, unless the court determines that it does not accurately state the law.” Thus, the trial court was required to give IPI Criminal 3d No. 7C.05 and that instruction, which tracks the language of section 9–1(g), likewise contains no constitutional infirmities.

CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Du Page County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, January 12, 1999, as the date on which the sentence of death entered in the circuit court of Du Page County is to be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119–5 (West 1996). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is confined.

Affirmed
.

FOOTNOTES
1:     
At oral argument before this court, defense counsel acknowledged that question No. 116 is “vague,” and that defense counsel at sentencing “were submitting as many questions they thought they reasonably might get.”

2:     
Section 9–1(b)(7) was subsequently recodified as section 9–1(b)(8) (720 ILCS 5/9–1(b)(8) (West 1994)) and although the text of the present statute differs somewhat from its predecessor, the aggravating factor remains similar in substance. Section 9–1(b)(8) presently makes the killing of an eyewitness a factor which qualifies for the imposition of the death penalty in those instances where:

“the defendant committed the murder with intent to prevent the murdered individual from testifying in any criminal prosecution or giving material assistance to the State in any investigation or prosecution, either against the defendant or another; or the defendant committed the murder because the murdered individual was a witness in any prosecution or gave material assistance to the State in any investigation or prosecution, either against the defendant or another[.]” 720 ILCS 5/9–1(b)(8) (West 1994).